ABSALOM FOWLER AND NOAH H. BADGETT, APPELLANTS, *v.* AYRES P. MERRILL.

The act of Congress passed on the 24th of September, 1789 (1 Stat. at Large, 88, 89), provides that *ex parte* depositions may be taken before a judge of a County Court.

Where a Probate Court is organized for each county in a State, is a court of record, and has a seal, it is sufficient if a deposition under that act be taken before a judge of the Probate Court.

Although the day when a mortgage was executed was not stated, yet where it bore a date in its commencement, and its acknowledgment and date of record were both given, and both of them preceded a sheriff's sale of the mortgaged property, it was certain that the mortgage was executed before the sale under execution.

Although, when the mortgage was recorded, the laws of the State did not make the mere recording convey the title when the personal property thus mortgaged remained in the possession of the mortgagor, yet they sanctioned the mortgage unless it was made without good consideration, and opposed by a *bonâ fide* subsequent purchaser, who had no notice of its existence.

But the fact of recording the mortgage tended to give notice of its existence, and in the present case the evidence shows that the purchasers at the sheriff's sale had notice of the mortgage.

Such purchasers must allege that their want of notice continued up to the time of making actual payment; a want of notice merely extending to the time of making the purchase is not enough. Payment might have been refused, and then they would not have been injured.

Moreover, between the time when the mortgage was in fact recorded and the time of the sheriff's sale, the State passed a law making such recorded mortgages valid.

The increase or offspring of slaves belong to the owner of the mother.

The decree of the Circuit Court being that the purchasers at the sheriff's sale should either surrender the property to, the prior mortgagee, or pay the value thereof, such value was properly computed as it was at the time of rendering the decree.

The hire of the slaves was properly charged as commencing when the prior mortgagee filed his bill for a foreclosure.

THIS was an appeal from the Circuit Court of the United States for the District of Arkansas, sitting as a court of equity.

It was a bill filed by Merrill, the appellee, against Fowler

and Badgett and other persons, under the following circumstances.

In April and June, 1837, N. L. Williams made the following notes:—

"$ 11,428$\frac{22}{100}$.　　　　　　　　　*Natchez, 1st April,* 1837.

" Two years after date, I promise to pay J. L. Dawson, or order, the sum of eleven thousand four hundred and twenty-eight dollars and twenty-two cents, value received. Negotiable and payable at the Planters' Bank of Mississippi, Natchez.

(Signed,)　　　　　　　　　　　N. L. WILLIAMS."

" $ 1,150.　　　　　　　　　　*Natchez, 1st June,* 1837.

" Twelve months after date, I promise to pay J. L. Dawson, or order, eleven hundred and fifty dollars, value received, negotiable and payable at the Planters' Bank of Mississippi, Natchez.

(Signed,)　　　　　　　　　　　N. L. WILLIAMS."

Making together the sum of $ 12,578.22.

These notes, indorsed by Dawson, were also indorsed by Merrill, and discounted for Dawson's use by the Planters' Bank of Mississippi at Natchez.

In order to secure Merrill, Dawson executed a mortgage to him of certain negroes then on the plantation of Dawson, in Arkansas. There were nine negro men, six women, and three boys included in the mortgage. As this mortgage was much discussed in the argument, it is proper to give its commencement and acknowledgment:—

" This indenture, made this 25th day of November, in the year of our Lord 1837, between James L. Dawson, of the county of Jefferson, State of Arkansas, of the one part, and A. P. Merrill, of the city of Natchez, State of Mississippi, of the other part, witnesseth: That the said James L. Dawson, in consideration of the debt to be secured, hereinafter mentioned, and of one dollar to him in hand paid by the said A. P. Merrill, the receipt whereof is hereby acknowledged, doth give, grant, bargain, sell, and convey unto the said A. P. Merrill, the following-described negroes, now on the plantation of the said James L. Dawson, known by the name of Woodstock, lying in the county of Jefferson, State of Arkansas, viz." &c., &c.

" To have and to hold the said negroes unto the said A. P. Merrill, his heirs and assigns, to the only proper use of the said A. P. Merrill, his heirs and assigns for ever. Provided, that if the said James L. Dawson, his executors and administrators,

or either of them, do pay, or cause to be paid, unto the said A. P. Merrill, his executors, administrators, or assigns, the just and full sum of $ 12,578.22, as mentioned in two certain notes of the following tenor, viz. No. 1, drawn by N. L. Williams, dated 1st April, 1837, at two years, for $ 11,428.22; 2 do. do., 1st June, 1837, twelve months, $ 1,150, indorsed by J. L. Dawson and A. P. Merrill, and payable at the Planter's Bank of Mississippi, Natchez, then these presents to be void; and the said James L. Dawson doth covenant with the said A. P. Merrill, that he, the said James L. Dawson, his executors, administrators, or assigns, shall and will pay, or cause to be paid, to the said A. P. Merrill, his executors, administrators, or assigns, the said sum of $ 12,578.22, as aforesaid, on the day above limited for the payment thereof.

"In testimony whereof, the said James L. Dawson has hereunto set his hand and seal, the day and year above written.

(Signed,)            JAMES L. DAWSON.

"Signed, sealed, and delivered in the presence of —

"*State of Mississippi, Adams County.*

"Personally came before me, Judge of the Probate Court in and for the county aforesaid, the within-named James L. Dawson, who acknowledged that he signed, sealed, and delivered the within instrument in writing, as his act and deed, for the purposes and intents, and on the day and year, therein mentioned.

"Given under my hand and seal, this 24th day of November, A. D. 1837.

"C. RAWLINGS, *Judge of Probate.*"

On the 29th of December, 1837, this mortgage was recorded in Arkansas.

On the 12th of March, 1841, the President and Directors and Company of the Commercial Railroad Bank at Vicksburg, suing for the use of William W. Frazier, Thomas E. Robbins, and William S. Bodley, obtained a judgment against Dawson in the Circuit Court of Pulaski County (State court of Arkansas). The amount of the judgment was, —

| | |
|---|---|
| Debt, | $ 9,688.00 |
| Damages, | 1,065.00 |
| Costs, | 8.95 |
| | $ 10,761.95 |

On the 24th of April, 1841, a *fieri facias* was issued upon

this judgment, and levied upon certain lands and eleven of the negroes mentioned in the mortgage.

After an *alias* writ, the property was exposed to sale on the 11th of October, 1841. Fowler became the purchaser of some of the negroes, and on the next day the sheriff executed a deed to him, reciting the judgment and execution, and concluding thus : —

" Now, know all men by these presents, that I, John J. Hammett, as such sheriff as aforesaid, for and in consideration of the premises, and for and in consideration of the said aggregate sum of $ 2,966.66⅔, to him, the said John J. Hammett, as such sheriff, in hand paid by the said Absalom Fowler, the receipt whereof is hereby acknowledged, have granted, bargained, sold, and delivered, and do hereby grant, bargain, sell, and deliver, all of said slaves above described to the said Absalom Fowler, hereby conveying to him, and to his heirs and assigns for ever, all of the right, title, estate, interest, claim, and demand of the said James L. Dawson, of, in, and to the same. Not making myself hereby responsible for the title of said slaves, but only conveying, as such sheriff, the title of the said James L. Dawson in and to the same.

" Signed, sealed, and delivered, this 12th day of October, A. D. 1841. Interlined on second and third pages before signed.

" John J. Hammett,
*Sheriff of Jefferson County, Arkansas.*"

Badgett subsequently purchased some of these slaves from Fowler, and other persons, who were made defendants in the bill filed by Merrill, were purchasers at the sale.

On the 4th of March, 1842, Merrill paid the notes of Williams, which had been discounted for Dawson's use by the Planters' Bank of Mississippi.

On the 7th of September, 1842, Merrill filed his bill in the Circuit Court of the United States for Arkansas, against the following persons ; viz. " James L. Dawson, who is a citizen of the State of Arkansas, but now temporarily residing in the Indian country west of the State of Arkansas, James Smith of Arkansas County, William Dawson of Jefferson County, Samuel C. Roane of Jefferson County, Samuel Taylor of Jefferson County, Nathaniel H. Fish of Jefferson County, Garland Hardwick of Jefferson County, Absalom Fowler of Pulaski County, Noah H. Badgett of Pulaski County, and all of whom are citizens of the State of Arkansas, and Sophia M. Baylor, who is a citizen of the State of Arkansas, but now

temporarily residing at Fort Gibson, in the Indian country, west of the State of Arkansas."

The bill stated the circumstances mentioned above, and then averred that the defendants purchased the slaves with notice of the mortgage. It then specially interrogated Fowler and Badgett, among other things, as to whether they ever had actual notice of the mortgage, and if so, when; and also as to the value of the slaves at the time they came into their possession, and their value at the time of filing the bill; and as to the worth of their services or hire after they came into defendants' possession; and whether Jackson and other children were the issue of the mortgaged slaves; and also as to the identity of the slaves themselves.

Defendants answered, setting up a *bonâ fide* purchase, without notice, at the sheriff's sale, and denying, as far as they knew or believed, all of the material allegations of the bill, and alleging that the mortgage was fraudulent; that Dawson had remained continuously in possession of the slaves, contrary to the terms of the deed; that they did not know whether the slaves were the same, and denied positively that Jackson was the issue of any one of the mortgaged slaves. In response to the interrogatories as to the value, hire, &c., Fowler answered, that Eliza, one purchased by him, and sold to Badgett, died before the commencement of the suit; that, at the time he purchased them, they were worth about what he gave for them, to wit: Tom, $533.33⅓; Phœbe and Jackson, $666.66⅔; Mary and Henry, $500; Maria and her child, $600; Eliza, $466.66⅔; and that, since the sale, the value of slaves generally, and these also, had depreciated at least one fourth; and that their hire, deducting necessary expenses, was worth, per annum, for Tom $70, Maria $50, Mary $40, Phœbe $40; and for the others, nothing. Badgett answers, also, that Phœbe was worth $400, Eliza $350, Jackson $65, and that Eliza had died, &c., and that their hire was not worth more than $40 per annum.

The valuation preparatory to the sheriff's sale was as follows:—

|  | Valued at | Sold for |
|---|---|---|
| Tom, | $800 | $533.33 |
| Phœbe and Jackson, | 1,000 | 666.66 |
| Mary and Henry, | 750 | 500.00 |
| Maria and her child, | 700 | 600.00 |
| Eliza, | 700 | 466.66 |

It is not necessary to trace the progress of the suit through

its various steps. Many depositions were taken under a commission, and otherwise, and exceptions to their admissibility filed. One of them, which is the subject of a part of the opinion of this court, will be particularly mentioned for that reason. The point, as raised and decided in the Circuit Court was as follows : —

" The fourth exception is, ' that the deposition of Henry D. Mandeville, taken at Natchez, on the 8th of March, 1845, was taken without any sufficient notice having been served on said defendants of the time and place of taking the same.'

" The answer to this exception is, that where a deposition is taken, according to the acts of Congress, at greater distance from the place of trial than one hundred miles, no notice is required. By the certificate of the magistrate before whom the deposition was taken, it appears that the witness lives more than one hundred miles from this place ; that his certificate is competent evidence of the fact, is established by the adjudication of the Supreme Court in the case of the Patapsco Insurance Company *v.* Southgate, 9 Peters, 617. The court say : ' It was sufficiently shown, at least *primâ facie*, that the witness lived at a greater distance than one hundred miles from the place of trial. This is a fact proper for the inquiry of the officer who took the deposition, and he has certified that such is the residence of the witness. In the case of Bell *v.* Morrison, 1 Peters, 356, it is decided that the certificate of the magistrate is good evidence of the facts therein stated, so as to entitle the deposition to be read to the jury.' This exception is overruled.

" The fifth exception is to the competency of the evidence contained in the deposition of Mandeville. The decision of this exception will be reserved to the final hearing.

" The sixth exception is to the authority of the magistrate before whom Mandeville's deposition was taken. It was taken before Thomas Fletcher, judge of the Probate Court within and for the county of Adams, and State of Mississippi, and the inquiry is, whether he is authorized by the acts of Congress to take depositions. By the 30th section of the Judiciary Act of 1789, depositions *de bene esse* may be taken before any judge of a county court of any of the United States. Is Thomas Fletcher a judge of a county court of any of the United States ? In order to decide this question, we must look into the laws of the State of Mississippi. That this court is bound to take notice of the laws of Mississippi is clearly settled by the Supreme Court of the United States in the case of Owings *v.* Hull, 9 Peters, 625. The court say, that the laws of all the States in the Union are to be judicially taken notice of, in the

same manner as the laws of the United States are to be taken notice of, by the Circuit Courts of the United States. Looking, then, into the laws of Mississippi, we find a Court of Probates established in each county of the State, with jurisdiction in all matters testamentary, and of administration of orphans' business; in the allotment of dower; in cases of idiocy and lunacy, and of persons *non compos mentis* (see § 18 of the 4th article of the Constitution, and the acts of the legislature of 1833, law 444). By the fourth section of the act it is provided, that the Court of Probate in each county shall procure a seal for said court, thereby constituting it a court of record.

" The question then is, Is this a county court? It is a court of record established in each county in the State, and styled ' the Probate Court of the County of ' I am clearly of opinion, that it is such a county court as is contemplated by the act of Congress, and that depositions may be taken before the judge thereof. The deposition of Mandeville is a deposition taken *de bene esse,* and may be read on the final hearing, unless the defendant shall show that the witness has removed within the reach of a subpœna after the deposition was taken, and that fact was known to the party, according to the decision of the Supreme Court in the case of the Patapsco Insurance Company *v.* Southgate, 5 Peters, 617. This exception is therefore overruled."

Roane and others of the defendants made a compromise with Merrill, which was sanctioned by the court, and the bill was dismissed as to Sophia M. Baylor.

On the 23d of August, 1847, the Circuit Court made a long explanatory decree, of which the following is the conclusion: —

" This cause came on to be heard at this term, and was argued by counsel; and thereupon, upon consideration thereof, it was ordered, adjudged, and decreed as follows, to wit: That the bill, as to the defendant, Sophia M. Baylor, be, and the same is hereby, dismissed, with her costs, to be paid by her to the said complainant. And it is further ordered and decreed, that unless the sum of $18,934 shall be paid or tendered to the said complainant, or his solicitor, by the remaining defendants, or any or either of them, on or before the first day of the next term of this court, they, the said defendants, are from thenceforth to stand absolutely debarred and foreclosed of and from all right, title, interest, and equity of redemption of, in, and to the said mortgaged property in the bill mentioned, and a sale of said mortgaged property decreed, if a sale thereof shall be deemed expedient by this court. And the question of hire of the mortgaged property, of costs, and all other questions in the

cause not now decided, are reserved to the further decree of this court.

"And it is further ordered, that this cause be, and the same is hereby, continued until the next term of this court.

"At the next term of the court a final decree was passed, fixing the value of the slaves and their hire, sanctioning the compromise made by some of the defendants, ordering a restitution of the slaves held by the rest, or, in case of neglect or refusal to restore, holding them responsible for the assessed value of such slaves."

Fowler and Badgett appealed from this decree to this court.

It was argued by *Mr. Lawrence*, for the appellants, and *Mr. Addison*, for the appellee.

The points made for the appellants were the following.

The appellants insist that the deposition of Mandeville, taken on the 8th of March, 1845, ought to have been suppressed on their exceptions.

It was taken before a judge of the Probate Court of Mississippi, an officer wholly unauthorized by sect. 30 of the act of September 24th, 1789, to take depositions *ex parte*, or by any other act of Congress. See 1 Stat. at Large, pp. 88, 89, § 30.

And the argument of the court below, that, because in that State there is a Probate Court established in each county, it is necessarily a county court, within the meaning of the act of Congress, is conceived to be wholly inconclusive and untenable. Upon the same reasoning, a court would be bound to infer that the Circuit Court, or Board of Police, established there in each county, is a county court. And if inferences of this kind be indulged, what may not be inferred? (See Const. of Miss., art. 4.)

Indeed, this Board of Police, which is entirely distinct from the Probate Court, is the substitute and legitimate successor of an abolished county court, inheriting nearly all of its powers. See Const. of Miss., art. 4; Hutchinson's Miss. Code (A. D. 1848), p. 710.

And if there be no county court there, either in fact or in name, by what authority could the Circuit Court for the District of Arkansas presume one into existence? And especially under a statute (Act of 1789, § 30) which admits of no presumptions whatever; and under which depositions taken must always strictly and rigidly conform to its words, or keep closely within their literal meaning. Bell *v.* Morrison, 1 Peters, 351 et seq.; 1 Cond. R. 535; U. States *v.* Smith, 4 Day, 127.

And if it be insisted that the deposition was taken on interrogatories, it was equally inadmissible; because, in such case, the court must always name the commissioners. See Rule 67 of this court, regulating practice in equity.

And this deposition, as also his third and last deposition, ought to have been suppressed, for the incompetency of the matter contained in them. As to matters taken from the books of the Bank, the statements as to the protest, a letter of Dawson, &c., &c.; because he neither produced the originals and identified them, nor deposed that he knew the matters to be true, otherwise than that they were so on the books, &c. See State v. Rawls, 2 Nott & McCord, 332; Peake's Ev. 190; Doe v. Perkins, 3 Durnf. & East, 754; 1 Phil. Ev. (by Cowen and Hill), 289.

The depositions taken by Merrill, of Traphall, Dorris, Walker, White, Bogy, and Hammett, ought to have been suppressed. They were to be taken on thirty-five interrogatories; only a part of which were propounded to each witness.

And the law is well settled, as it seems, that each and every interrogatory must be put to each and every witness, and answered by him, or the depositions cannot be read. Richardson v. Golden, 3 Wash. C. C. 109; Bell v. Davidson, 3 Ib. 332 et seq.; Dodge v. Israel, 4 Ib. 323; Kimball v. Davis, 19 Wend. 439; Brown v. Kimball, 25 Ib. 265; Withers v. Gillespy, 7 Serg. & Rawle, 16; Ketland v. Bissett, 1 Wash. C. C. 144; Winthrop v. The Union Ins. Co., 2 Ib. 12.

And upon the exclusion of the depositions excepted to, or only Mandeville's, Merrill has nothing remaining upon which his decree can stand; he has no case at all.

An absolute sale of chattels, where the possession remains with the vendor, is void as to his creditors. Sturtevant v. Ballard, 9 Johns. 337 et seq.; Meeker v. Wilson, 1 Gallis. C. C. 422; Ryal v. Rowles, 1 Ves. sen. 359; 2 Kent's Comm. 406 – 410; Hamilton v. Russell, 1 Cranch, 309; Clow v. Woods, 5 Serg. & Rawle, 278; Cunningham v. Neville, 10 Ib. 201.

Even a stipulation in the deed of sale, for the retention, unless satisfactory to the court, does not form an exception to the rule. 9 Johns. 337 et seq.; 2 Kent's Comm. 412; 5 Serg. & Rawle, 279; Divner v. McLaughlin, 2 Wend. 599.

And does not the same rule apply to mortgages of personal property, both at common law and under the statutes of frauds? 2 Kent's Comm. 406 – 412; Ryall v. Rolle, 1 Atk. 167; Worsley v. De Mattos, 1 Burr. 467; 5 Serg. & Rawle, 278; Fuller v. Acker, 1 Hill, (N. Y.) 475; 9 Johns. 340 et seq.; Smith v. Acker, 23 Wend. 653; 1 Gallis. C. C. 423; Look v. Comstock, 15 Wend. 246; Murray v. Burtis, Ib. 212; 4 Yerg.

541; 7 Ib. 445; Powell on Mortg. 23, 24; Cadogan v. Kennett, Cowp. 434; Conard v. Atlantic Ins. Co., 1 Peters, 449; Barrow v. Paxton, 5 Johns. 261; Thornton v. Davenport, 1 Scam. 299; 2 Wend. 599; 13 Serg. & Rawle, 131.

This is an absolute mortgage, on its face, containing no stipulation whatever that Dawson should retain possession.

And as such, it is a conveyance executed, and passed the legal title to the slaves to Merrill. Powell on Mortg. 23, 24; 1 Peters, 441; 1 Ves. sen. 359; 5 Serg. & Rawle, 283 et seq.; 20 Wend. 262.

And immediately on the execution of the mortgage, Merrill was entitled to the possession of the slaves, and to maintain a suit for them. Doe v. Grimes, 7 Blackf. 1; Rockwell v. Bradley, 2 Conn. 4; 14 Peters, 28; 12 Serg. & Rawle, 241; 3 Johns. Cas. 326; 2 Conn. 447; Newall v. Wright, 3 Mass. 152; 1 Freem. Ch. 473; Hobart v. Sanborn, 13 N. Hamp. (1st vol. 2d series), 227.

At any rate, as soon as the first note fell due, in 1838, Merrill's title became absolute at law, and he had a right to immediate possession. Spalding v. Scanland, 4 B. Monroe, 365; 12 Wend. 62; Robinson v. Campbell, 8 Missouri, 366, 616; 10 Johns. 481; Dexter v. Harris, 2 Mason, C. C. 531; 5 Cond. Rep. 655; 20 Wend. 262; 1 Branch, 270; 1 Hill, (N. Y.) 475; 7 Cow. 292; 6 Paige, Ch. 587, 596; Lansing v. Capron, 1 Johns. Ch. 617; Adams v. Essex, 1 Bibb, 150; Estabrook v. Moulton, 9 Mass. 258; Hopkins v. Thompson, 2 Porter, 435.

And his permitting Dawson to remain in possession, after such failure to pay the note first due, without disturbance, and without a stipulation in the deed to that effect, makes the whole fraudulent and void as to Dawson's creditors. Goder v. Standifer, 7 Monroe, 488; 2 Kent's Comm. 407–413; 1 Burr, 475; 4 Mass. 637; 15 Verm. (1 Slade) 135; Gardner v. Adams, 12 Wend. 298; Thornton v. Davenport, 1 Scam. 299; Semple v. Burd, 7 Serg. & Rawle, 288; 13 Ib. 131, 169.

Conveyances of slaves, at the time of the alleged execution of this mortgage, were required to be acknowledged or proved before the clerk of the Superior Court, of a Circuit Court, a justice of the peace, or other competent authority, within the county where one of the parties resided, and there recorded. Steele & McCampb. Ark. Dig. 267.

The conclusion of the court below, that it may be lawfully recorded without probate, is based on error; for the same act of October 1, 1804, upon which the conclusion was founded, places the probate before the record; and it is consequently a prerequisite. Steele & McCampb. Dig., p. 132, § 2, p. 454,

§ 1.; Geyer's Digest of Laws of Missouri Territory, p. 127, § 2, p. 330, § 1.

And the mortgage being acknowledged before a judge of probate of the State of Mississippi, who was wholly unauthorized by any legislative act of Arkansas, such acknowledgment is a mere nullity, and so is the pretended registry. Richardson v. Randolph, 5 Mason, C. C. 116; Coale v. Harrington, 7 Hár. & Johns. 155; Miller v. Henshaw, 4 Dana, 330; Eastland v. Jordan, 3 Bibb, 187; Shultz v. Moore, 1 McLean, C. C. 527; Johnston v. Haines, 2 Ham. 55.

And if it be such an instrument as was not by law required to be recorded, its registry gives it no validity. 1 Story's Eq. Jurisp. § 404; 5 Mason, C. C. 265; 1 Gilman, 331.

And, if not duly registered, it is void, as to Dawson's creditors, though they had notice of its existence. 4 Rand. 212; 4 English, (Ark.) 116, &c.; 5 Litt. 244; 1 Johns. Ch. 300; 4 Bibb, 79.

And a purchaser, under the creditor's judgment, occupies the same position as the creditor himself. Sands v. Hildreth, 14 Johns. 497; 4 Rand. 212; Hildreth v. Sands, 2 Johns. Ch. 35 et seq.; 7 Blackf. 68; 1 McLean, C. C. 39; 4 Wash. C. C. 137; 1 Paige, Ch. 508; 11 Missouri, 544; 2 Wend. 601.

And if improperly recorded, or the statute does not make the record notice, as it does not in this case, such registry is not constructive notice to purchasers. 1 Story's Eq. Jurisp. § 404; 5 Mason, C. C. 115, 265; Moore v. Hunter, 1 Gilman, 331; 1 McLean, C. C. 527; McIver v. Robertson, 3 Yerg. 84; Heister v. Fortner, 2 Binn. 44; 4 Dana, 330; Gann v. Chester, 5 Yerg. 208; 12 Smedes & Marsh. 266; Main v. Alexander, 4 English, (Ark.) 116; 1 Dana, 168.

Again, there is no legitimate proof in the record to show when the mortgage was executed. It must, therefore, be presumed to be included in the category and class of deeds mentioned in the following paragraph, under the act of 1838. And the only proof of the execution of the mortgage being the mere signature of Dawson, the legal presumption must be that it had no valid existence until the filing of the bill, and after defendants' rights accrued.

This mortgage, placing it in the strongest possible view in Merrill's favor, being unrecorded, fixed no lien in his favor as against Dawson's creditors, who had no notice of it. This is unquestionable. Soon after the alleged execution of the mortgage, to wit, on the 20th of February, 1838, the legislature of Arkansas passed an act, declaring that " all mortgages " " for personal property " should " be acknowledged before some person authorized by law to take the acknowledgment of deeds,"

and recorded in the county where " the mortgagor resides."
And that such mortgage, when so filed for record, " and not
before," should be a lien on the property. And that the re-
corder should " note, in the record, the precise time such mort-
gage was filed for record." See Rev. Stat. of Arkansas (A.
D. 1838), p. 578, ch. 101.

Was it not incumbent on Merrill so to have this mortgage
recorded ? And was it not expressly embraced in this act by
its general phraseology ? If so, he having utterly failed to
comply with it, this case comes directly within the decision of
the Supreme Court of Arkansas in Main *v.* Alexander, 4 Eng-
lish, 116.

And the decisions of a State court, on its own statutes, is
the rule for the United States courts. 13 Peters, 21, 63, 328;
2 McLean, C. C. 433; 1 Ib. 36; 6 Peters, 297; 5 Ib. 401.

Was actual notice proved ?

Fowler positively denies notice in his answer; and this can
only be overturned by one positive witness, and corroborating
circumstances equal to another. 2 Stor. Eq. Jur. § 1428;
Flagg *v.* Mann, 2 Sumn. C. C. 550; 5 Mason, C. C. 267, 268;
1 Greenl. Ev. § 260; Simpson *v.* Feltz, 1 McCord, Ch. 218;
Hart *v.* Ten Eyck; 2 Johns. Ch. 92; Gres. Eq. (ed. of 1837),
156; 9 Cranch, 160; 20 Pick. 34; 10 Johns. 540; 5 Cond. R.
136; 1 Mason, C. C. 515; 1 Call, 280; 5 Peters, 111; Sug. on
Vend. 550; 2 Wash. C. C. 199; 1 Cow. 703.

And it is submitted to the court, whether there is any wit-
ness at all, who has sworn positively to such notice; and if
not, can a court infer it from the circumstances alone, how-
ever strong they may be, against the answer's positive denial?
The respondent speaks of a matter within his own knowledge;
the witnesses from their impressions, and belief from other
mere circumstances, without any pretence of actual knowl-
edge. And the answer, as evidence, must have the same
weight as disinterested witnesses. Sturtevant *v.* Waterbury,
1 Edw. Ch. 444; Sug. on Vend. 550; Clarke's Ex. *v.* Van
Reimsdyk, 9 Cranch, 160; 1 Greenl. Ev. § 260; 10 Johns. 542;
1 Cow. 743.

The only evidences of actual notice to Fowler, even at the
sale, are, that he was in the crowd when Trapnall forbade the
sale, and during the progress of the sale purchased some of
the slaves ; the beliefs of the testy Frenchman, Bogy; the
thoughts and beliefs of White; the beliefs of Walker; and the
impressions of Trapnall; none of whom testify positively, or
with any degree of certainty.

Appellants insist, that such evidence does not even make a
*primâ facie* case of notice; much less is it sufficient to over-

whelm the positive negative of the answer. Because the rule of law is, that, where witnesses state facts to the best of their knowledge and belief, impressions, thoughts, or understanding, without detailing the facts upon which they are based, or from which they were induced or derived, they do not even amount to negative evidence; they are not evidence at all. Woodcock *v.* Bennett, 1 Cow. 748 et seq.; Clason *v.* Morris, 10 Johns. 531; Bright *v.* Haggin, Hardin, 537; Van Dyne *v.* Tharpe, 19 Wend. 165; Smith *v.* Frost, 2 J. J. Marsh. 426; Andrews & Bros. *v.* Jones, 10 Ala. Rep. (New Series), 470; Ventress *v.* Smith, 10 Peters, 171; 1 McCord, Ch. 218; 4 Ala. Rep. (New Series), 48; 2 Comstock, 515; 5 Porter, 343; 1 Dana, 163.

Notice in fact must be such as to affect the subsequent purchaser with fraud. Curtis *v.* Lunn, 6 Munf. 44; 1 Stor. Eq. Jur. § 404; Dey *v.* Dunham, 2 Johns. Ch. 190; Grinstone *v.* Carter, 3 Paige, Ch. 423.

And the proof of it must be clear, undoubted, direct, and conclusive. 6 Munf. 44; 1 Stor. Eq. Jur. § 406; McNeill *v.* McGee, 5 Mason, C. C. 265; 2 Sumn. C. C. 550; Sug. on Vend. 730; 2 Pow. on Mort. 560, 562; Martin *v.* Dryden, 1 Gilman, 208; McMeechan *v.* Griffing, 3 Pick. 154.

Mere presumptions of notice, from rumors, &c., in Dawson's neighborhood, cannot attach to Fowler, who resided in a different county. 2 Sumn. C. C. 551.

The witnesses even disagree about whose encumbrance it was that Trapnall gave notice of; whether Merrill's, William Dawson's, or some other.

Even if the indefinite impressions, beliefs, and discrepances in the recollections of the witnesses, so manifest in their depositions, be deemed sufficient to fix notice in fact upon Fowler, at the sale; and there is no pretence that he had any until then; and the record shows that he resided in a different county, and could not, therefore, be affected by rumors in Dawson's neighborhood; such notice is utterly inoperative.

Because notice to a judgment creditor, or a purchaser under his judgment, of a prior assignment, or mortgage, of the debtor's property, where possession has not been taken under it, cannot affect the right of either. 1 Gallis. C. C. 419; Russell *v.* Fillmore, 15 Verm. 135; 4 Eng. (Ark.) 116; Warden *v.* Adams, 15 Mass. 236; 7 Serg. & Rawle, 288 et seq.; 13 Ib. 131, 169.

And such creditor, or purchaser under his judgment, although he receive actual notice at the sale under execution, will hold the legal title, whether of land or personalty, in preference to an unrecorded deed, or mortgage, executed prior to the judgment, or execution lien. Guerrant *v.* Anderson, 4 Rand. 212;

5 Yerg. 208; Hill *v.* Paul, 8 Missouri, 480; Reed *v.* Austin's Heirs, 9 Missouri, 729; Frothingham *v.* Stacker, 11 Missouri, 78; Garnett *v.* Stockton, 7 Humph. 85; Bingaman *v.* Hyatt, 1 Smedes & Marsh. Ch. 444; Martin *v.* Dryden, 1 Gilman, 218; McGowan *v.* Hoy, 5 Litt. 245; Helm *v.* Logan, 4 Bibb, 79; Farnesworth *v.* Childs, 4 Mass. 637; Main et al. *v.* Alexander, 4 Eng. (Ark.) 117; Semple *v.* Burd, 7 Serg. & Rawle, 289 et seq.; Stow *v.* Meserve, 13 N. Hamp. (1st vol. 2d series), 49; 15 Mass. 236; Coffin *v.* Ray, 1 Metcalf, 213; 1 Dana, 168; 13 Serg. & Rawle, 169.

A principle settled in the foregoing cases is, that where a *bonâ fide* creditor, without notice of a prior unregistered conveyance, obtains a lien by virtue of a judgment, attachment, or execution, subsequent notice, whether before or at the sale, cannot affect the purchaser or creditor, but he must in equity, as well as at law, hold the property against the former unregistered deed.

In this case, the lien was fixed when the execution was delivered to the sheriff. See Rev. Stat. of Ark., A. D. 1838, ch. 60, p. 378, § 24.

The court below appears to have thought that the answer did not contain a sufficient averment as to the payment of the purchase-money before notice, &c., and therefore no proof of notice was necessary. Fowler's answer does make substantially and fully such denial and averment.

And even if the answer were technically defective in this particular, it should have been excepted to, and a more perfect response obtained; but being replied to, the defect, if any existed, is waived. 1 Freem. Ch. 547; 5 Mason, C. C. 266.

The value of the slaves, and of their hire, decreed by the court below, is excessive beyond all reason, and in direct violation of both the law and the evidence.

The value ought to have been estimated as at the time of the decree, and their reasonable hire from the filing of the bill until that time. See 1 Brockenb. (Chief Justice Marshall) 515, Backhouse's Ad. *v.* Jett's Ad.

And in estimating the hire, all reasonable charges and expenses, such as taxes, medical attendance, clothing, raising of the children, &c., &c., ought to have been deducted. Mims *v.* Mims, 3 J. J. Marsh. 109; 1 Dana, 286.

These equitable rules were disregarded.

To arrive at a correct conclusion on this point, the answers must be looked to; and they, indeed, according to the well-settled rules of evidence in equity, furnish the only guide for the decree, as to value and hire.

The bill expressly interrogates both Fowler and Badgett as to their value when purchased, their value when suit was commenced, and of their continued hire. They answer expressly these interrogatories.

And there can be no question that their answers are responsive to the bill; and, as such, conclusive evidence in their favor, unless overturned by two witnesses, or one positive witness, with strong corroborating circumstances. See the authorities above referred to on this point; the elementary works and reports on equity *passim;* and especially the following cases: Woodcock *v.* Bennett, 1 Cowen, 742; 2 Sumner, 506; Mills *v.* Gore, 20 Pick. 34; 2 Story, Eq. Jur. § 1528; 9 Cranch, 160; Allen *v.* Mower, 17 Verm. (2 vol. N. S.) 68; Christie *v.* Bishop, 1 Barb. Ch. 115; Oakey *v.* Rabb, 1 Freem. Ch. 547; Pierson *v.* Clayer, 15 Verm. (1 Slade), 104; Russell *v.* Moffitt, 6 How. (Miss.) 309.

The answers, responding to these direct interrogatories, declare that the purchase-money paid by Fowler was then the full value of the slaves, and that their value had greatly depreciated since, at least one fourth, with the general decline in the price of slaves, and that their profits or hire had necessarily declined also; and further state the net value of their hire, after deducting the proper charges, expenses, &c. Have the answers been set aside by the necessary witnesses? The record will be sought for them in vain. None of the witnesses pretend to speak of their value after the sale; and those who speak of hire mention it in gross, without deducting the proper charges and expenses.

White says they sold for about what they were worth, and were appraised too high, fully sustaining the answers.

Bogy says, at the time they were valued, he thinks they were worth what they were appraised at; but cannot say what the precise value of either of them was.

The answer, then, fully sustained by White, equal to three witnesses, cannot be overturned by the solitary testimony of Bogy. Even if Hammett's evidence should not be suppressed, it is only two witnesses against the answer and White; and the latter must even then prevail, because the former lacks the strong corroborating circumstances. And there is no evidence at all militating against the answers as to the depreciation in value after the sale. Rowton *v.* Rowton, 1 Hen. & Munf. 101.

And the appraisement list cannot be brought in aid of Bogy. For it is not evidence. Lawson *v.* The State, 5 Eng. (Ark.) 36.

The answers, then, must be taken as true, and conclusively so, as to the value and hire; and the decree being for about,

33*

or more than twice as much as the answers disclose, must be reversed on that ground, if on no other, that a correct account may be taken.

The decree against Badgett is also erroneous, because it decrees him to pay the value of Jackson, without any proof that he was the issue of one of the mortgaged slaves, against the denials of the answers. And because it decrees him to pay the value of Eliza, who died before the institution of the suit. 1 Brockenb. 515.

And even if notice be fixed upon Badgett, it cannot affect him, if Fowler was a *bonâ fide* purchaser. Mitf. Pl. 224; 1 Atk. 571; 2 Bro. Ch. 66; 1 Stor. Eq. Jur. § 409; 6 Munf. 44; Boone *v.* Chiles, 10 Peters, 209; 3 Ala. (N. S.) 475.

The points raised by the counsel for the appellee were the following.

1. That the mortgage was executed by Dawson and received by Merrill in good faith, to secure the latter from loss on account of indorsements made by him for Dawson's accommodation.

2. That the notes were protested, and notice duly given and the notes paid by Merrill. Brandon *v.* Loftus, 4 Howard, 128.

3. That the laws of Arkansas in force in November, 1837, did not require mortgages of personal property to be recorded.

4. That under these circumstances the mortgage would be good, even against subsequent *bonâ fide* purchasers without notice, notwithstanding the mortgagor's continuing in possession of the mortgaged goods. Powell on Mortg. 42 – 44; Edwards *v.* Harben, 2 Term Rep. 587; Hamilton *v.* Russell, 1 Cranch, 317, 318; U. States *v.* Hooe et al., 3 Cranch, 73; Bank of Georgia *v.* Higginbottom, 9 Peters, 60; Shirras *v.* Caig and Mitchell, 7 Cranch, 34; Stone *v.* Grubham, Bulstrode, 225; Meggott *v.* Mills, 1 Ld. Raym. 287; Brooks *v.* Marbury, 11 Wheat. 78.

And notwithstanding the appellee did not take possession of the negroes immediately on the notes being protested. Lady Lambert's case, Sheppard's Touchstone, 67; 1 J. J. Marshall, 227; 2 Dana, 204; 8 Peters, 32, 33; 3 Cowen, 189; 2 Wendell, 600.

5. That the laws of Arkansas, in force in 1837, although they did not require, yet allowed the recording of this mortgage, and such recording operated as notice to all the world. Steele & McCampbell's Digest of Laws of Arkansas, titles "Mortgage," Recorder." See District Judge's Opinion in this case, pp. 188, 189.

Fowler et al. *v.* Merrill.

6. That the appellants had actual notice at the time of their purchase of the existence of this mortgage, and their purchasing with such notice is fraudulent against the appellee, and they can derive no rights against the appellee through such purchase.   Le Neve *v.* Le Neve, 3 Atk. 646 ; 1 Story's Eq. 395, 397 ; Wormley *v.* Wormley, 8 Wheat. 449.

7. That at all events the appellants had sufficient notice to put them on inquiry, which, if they failed to make, they cannot claim the rights appertaining to *bonâ fide* subsequent purchasers without notice.   1 Story's Eq. § 400, note 4, § 400 a.

8. That the answers of the appellants do not allege that they had no notice of the mortgage before the payment by them of the purchase-money, and such allegation is indispensable to a valid defence by subsequent purchasers.   Frost *v.* Beekman, 1 Johns. Ch. 300 ; 2 Daniell's Chancery Practice, 814 ; Jewett *v.* Palmer, 7 Johns. Ch. 68 ; Harrison *v.* Southgate, 1 Atk. 538 ; Story *v.* Ld. Windsor, 2 Atk. 630 ; Wigg *v.* Wigg, 1 Atk. 384 ; Tourville *v.* Naish, 3 P. Wms. 306 ; Jones *v.* Thomas, 3 P. Wms. 244 ; Hardingham *v.* Nicolls, 3 Atk. 304 ; Wormley *v.* Wormley, 8 Wheat. 449.

9. That after hearing it is too late to apply for leave to amend the answer in this respect.   Story's Eq. Pl. 896, 901. And there is nothing in the record from which it may be inferred that they could amend, or that they wanted leave to do so.

10. That Fowler only purchased Dawson's equity of redemption.   4 Randolph, 212.

The counsel for the appellants insists upon the following exceptions.

### Mandeville's Deposition, 8th March, 1845.

1. Because no notice of its caption was given.

The appellee contended that none was necessary, because it was taken more than one hundred miles from the residence of the appellants.   Act of 1789, ch. 20, § 30 (1 Stat. at Large, 89).

2. Because it was taken before a Probate Court.

The appellee contended, that it was a court within the meaning of the act of 1789, ch. 20, § 30.   (See opinion of the district judge in this case, and the constitution and laws of Mississippi as there cited.)   But even if it ought to have been suppressed, the same facts are sufficiently proven in his deposition taken before the Mayor of Natchez.

### Depositions taken at Pine Bluffs.

1. Because the name of one of the defendants, J. L. Dawson, does not appear in the certificate of the commissioners.

The appellee contended, that the cause in which it was taken sufficiently appears.   Keene *v.* Meade, 3 Peters, 1 ; Jordan *v.* Hazard, 10 Ala. 224.

2. (*a.*) Because sufficient notice was not given of the filing of the interrogatories.

The appellee will rely on the 13th Rule of Practice for the Equity Courts of the United States.

(*b.*) Because sufficient notice was not given of the time and place of taking the depositions.

The appellee contended, that, the commission being *ex parte,* notice was unnecessary.   1 Newland's Ch. Prac. 262 ;   Harr. Ch. Prac., ed. 1808, p. 244 ; 1 Smith's Ch. Prac. 365.

3. Because each interrogatory was not propounded to each of the witnesses.

The appellee contended that this was unnecessary, and that it would have been irregular to have done so.   Daniell's Ch. Practice, 1052, 1061 ; Gresley's Eq. Ev. 67, 104 ; 1 Turner's Ch. 32 (Introduction) ; 1 Smith's Ch. Prac. 368.

And the appellee contended, that, if the depositions taken at Pine Bluffs ought to have been suppressed, still without them there is in the appellants' commission, and in the other evidence, sufficient proof to entitle him to the decree as passed.

The appellants object, that the court improperly dismissed the bill against Mrs. Baylor.

The appellee contended, —

1. That there was not sufficient evidence to warrant a decree against her.

2. But that if the court did err in that respect, it operated no prejudice to the appellants, as the value of the negroes held by her, and their hire, would not, together with the several sums decreed against all the other defendants, be equal to the mortgage debt.

Mr. Justice WOODBURY delivered the opinion of the court.

This was an appeal from a decree of the Circuit Court of the United States for the District of Arkansas.

The decree was in favor of Merrill, on a bill in chancery to foreclose a mortgage of certain negroes, described therein and executed to him, November 25, 1837, to secure him for indorsing two notes made in April and June, 1837, the first payable in one year and the other in two years, for $ 12,578.42 in the aggregate.   These notes run to F. L. Dawson or order, and were by him indorsed to the plaintiff, Merrill, and by him to the Planters' Bank for Dawson, who obtained the money thereon for himself.   This mortgage was recorded December 29, 1837.

The notes not being taken up by Dawson, Merrill was compelled to pay their amount and interest, on the 4th of March, 1842.

The bill then proceeded to aver, that the defendants below, viz. James L. Dawson, James Smith, William Dawson, and others, had since got possession of these negroes, some of one portion of them and some of another. And that, although they were bought with full notice of Merrill's prior rights to them under the above mortgage, yet the respondents all refuse to deliver them to him, or pay their value and hire towards the discharge of the mortgage. Whereupon he prayed that each of them be required to deliver up the negroes in his possession, and account for their hire or to pay their value.

The court below decided, that $ 18,934 be paid to Merrill by the respondents, excepting Mrs. Bayler, and, on failure to do it, that the redemption of them be barred, and other proceedings had, so as eventually to restore the slaves or their value to the mortgagee.

Several objections to this decree and other rulings below were made, which will be considered in the order in which they were presented.

Some of the depositions which were offered to prove important facts had been taken before "a judge of the Probate Court" in Mississippi, when the act of Congress allows it in such cases before "a judge of a county court." 1 Stat. at Large, 88, 89.

But we think, for such a purpose, a judge of probate is usually very competent, and is a county judge within the description of the law.

In Mississippi, where these depositions were taken, a Probate Court is organized for each county, and is a court of record, having a seal. Hutch. Dig. 719, 721. Under these circumstances, were the competency of a probate judge more doubtful, the objection is waived by the depositions having been taken over again in substance before the Mayor of Natchez.

The other objections to the depositions are in part overruled by the cases of Bell *v.* Morrison et al., 1 Peters, 356, and Patapsco Ins. Co. *v.* Southgate et al., 5 Peters, 617.

On the rest of them not so settled, we are satisfied with the views expressed below, without going into further details.

The next exception for our consideration is, that the time of the execution of the mortgage is not shown, and hence that it may have been after the rights of the respondents commenced.

But it must be presumed to have been executed at its date

till the contrary is shown; and its date was long before. Besides this, it was acknowledged probably the same day, being certified as done the 24th of November, 1837. And though this was done out of the State, yet, if not good for some purposes, it tends to establish the true time of executing the mortgage. It must also have been executed before recorded, and that was December 29th of the same year, and long before the sale in October, 1841, under which the respondents claim.

The objection, that the handwriting of the record is Dawson's, does not impair this fact, or the legality of the record as a record, it having doubtless been allowed by the register, and being in the appropriate place in the book of records.

It is next insisted, that, as the negroes were left in the possession of Dawson after the mortgage, and were seized and sold to the respondents in October, 1841, to pay a debt due from Dawson to the Commercial Bank of Vicksburg, and as the respondents were innocent purchasers, and without notice of the mortgage, the latter was consequently void. This is the substance of several of the answers. Now, whether a sale or mortgage, without changing the possession of the property, is in most cases only *primâ facie* evidence of fraud, or is *per se* fraud, whether in England or in some of the States, or in Arkansas where this mortgage and the sale took place, may not be fully settled in some of them, though it is clear enough in others. (See cases cited in 2 Kent's Com. 406 – 412.) So whether a sound distinction may not exist at times between a mortgage and a sale, need not be examined, though it is more customary in all mortgages for the mortgager honestly to retain the possession, than to pass it to the mortgagee. U. States *v.* Hoe, 3 Cranch, 88; Haven *v.* Low, 2 N. Hamp. 15. See 1 Smith's Leading Cases, 48, note; Brooks *v.* Marbury, 11 Wheat. 82, 83; Bank of Georgia *v.* Higginbottom, 9 Pet. 60; Hawkins *v.* Ingolls, 4 Blackf. 35. And in conditional sales, especially on a condition precedent *bonâ fide*, the vendor, it is usually considered, ought not to part with the possession till the condition is fulfilled. See in 9 Johns. 337, 340; 2 Wend. 599. See most of the cases collected in 2 Kent's Com. 406.

But it is unnecessary to decide any of these points here, as, in order to prevent any injury or fraud by the possession not being changed, a record of the mortgage is in most of the States required, and was made here within four or five weeks of the date of the mortgage, whereas the seizure and sale of the negroes to the respondents did not take place till nearly four years after.

Yet it is urged in answer to this, that the statute of Arkan-

sas, making a mortgage, acknowledged and · recorded, good, without any change of possession of the articles, did not take effect till March 11th, 1839, over a year after this record.

Such a registry, however, still tended to give publicity and notice of the mortgage, and to prevent as well as repel fraud, and it would, under the statute of frauds in Arkansas, make the sale valid if *bonâ fide* and for a good consideration, unless against subsequent purchasers without notice. Rev. Statutes, ch. 65, § 7, p. 415.

There is no sufficient proof here of actual fraud, or *mala fides*, or want of a full and valuable consideration. And hence the objection is reduced to the mere question of the want of notice in the respondents. In relation to that fact, beside what has already been stated, evidence was offered to show, that the existence of the mortgage was known and talked of in the neighborhood, and proclaimed publicly at the sale.

Indeed, some of the evidence goes so far as to state, that, after the notice of the mortgage at the sale, the sheriff proceeded to sell only the equity of redemption, or to sell the negroes subject to any encumbrances. His own deed-says expressly, " hereby conveying all of the right, title, estate, interest, claim, and demand of the said James L. Dawson, of, in, and to the same, not making myself hereby responsible for the title of said slaves, but only conveying, as such sheriff, the title of said James L. Dawson in and to the same."

The proof likewise brings this actual notice home to each of the respondents, before the purchase, independent of the public record of the mortgage and the public declaration forbidding the sale at the time, on the ground that the mortgage existed and was in full force.

According to some cases, this conduct of theirs under such circumstances would seem more fraudulent than any by Merrill. Le Neve *v.* Le Neve, 3 Atk. 646; 1 Stor. Eq. 395; 8 Wheat. 449. Beside this, the answer should have averred the want of notice, not only before the sale, but before the payment of the purchase-money. Till the actual payment the buyer is not injured, and it is voluntary to go on or not when informed that the title is in another. Wormley *v.* Wormley, 8 Wheat. 449; Hardingham *v.* Nicholls, 3 Atk. 304; Jewett *v.* Palmer et al., 7 Johns. Ch. 68. See Le Neve *v.* Le Neve, 3 Atk. 651.

There is another view of this transaction, which, if necessary to revert to, would probably sustain this present mortgage. The Arkansas law to make a mortgage valid if recorded, passed February 20th, 1838 (Rev. Stat. p. 580). This mortgage was on record then, and since, and had been from December, 1837, thus covering both the time when the law took effect

and when the respondents purchased. It was also acknowledged then, and though not before a magistrate in Arkansas, yet before one in Mississippi; and in most States, the acknowledgment may be before a magistrate out of the State as well as in, if he is authorized to take acknowledgments of such instruments.

Nothing appears in the record here against his power to do this. Some complaint is next made of the delay by Merrill to enforce his mortgage against Dawson.

But it will be seen on examining the evidence, that he was not compelled to pay Dawson's notes to the bank till March 4th, 1842, and that these negroes were sold to the respondents and removed some months before, viz. October 11th, 1841, so that no delay whatever occurred on his part to mislead the respondents.

It was next objected, that two or three children, born since the mortgage, should not be accounted for, and one woman, who is supposed to have died after the sale and before this bill in chancery.

But it seems to accord with principle, that the increase or offspring should belong to the owner of the mother (2 Bl. Com. 404; Backhouse's Admr. *v.* Jetts's Admr., 1 Brock. C. C. 511); and the evidence is so uncertain whether the death of Eliza occurred after this bill or before, that the doubt must operate against the respondents, whose duty it was to prove satisfactorily that it happened before, in order to be exonerated.

It is argued further against the decree, that the respondents were made to account below for a boy, not proved clearly to have been born of one of the mortgaged women. But there seem circumstances in the case from which it might be inferred that he was so born. He was brought up among them, he was under the care chiefly of one, and no other person is shown to have been his parent.

We do not see enough, therefore, to justify us in differing from the judge below on this point.

The rules adopted in the Circuit Court for fixing the value to be paid for the negroes are also objected to, but seem to us proper. 1 Brock. C. C. 500.

The mortgaged property is given up or taken possession of by the mortgagee usually at the time of the decree; and if not surrendered then, its value at that time, instead of the specific property mortgaged, must be and was regarded as the rule of damages.

The injury is in not giving it up when called for then, or in not then paying the mortgage, and not in receiving it some years before, and not paying its value at that time.

Fowler et al. *v.* Merrill.

This is not trover or trespass for the taking of it originally, but a bill in chancery to foreclose the redemption of it by a decree, and hence its value at the time of the decree is the test of what the mortgagee loses, if the property is not then surrendered.

There is another exception to the estimate made of the value of the hire of the slaves. Their hire or use was charged only from the institution of this bill in chancery. This surely does not go back too far. 1 Brock. C. C. 515.

And some analogies would carry it back further, and in a case like this charge it from the period of their going into the possession of the respondents. But they object to the hire allowed ; because, it is said, that clothing, medicine, &c., during this time should have been deducted. 1 Dana, 286 ; 3 J. J. Marshall, 109.

We entertain no doubt, however, that in fact the hire here was estimated as the net rather than gross hire, and all proper deduction made. It is only a hundred dollars in one case, and seventy in others, which manifestly might not equal their gross earnings, while nothing is charged for the children. Testimony, too, was put in as to the proper amount for hire, and the judge as well as witnesses belonging to the country, and being acquainted with its usages, doubtless made all suitable deductions.

There is no evidence whatever to the contrary.

And on the whole case, we think the judgment below should be affirmed.

### Order.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the District of Arkansas, and was argued by counsel. On consideration whereof, it is now here ordered, adjudged, and decreed by this court, that the decree of the said Circuit Court in this cause be, and the same is hereby, affirmed, with costs.