# ALBERTY *v.* UNITED STATES.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF ARKANSAS.

No. 853. Submitted March 4, 1896. — Decided April 20, 1896.

Alberty, the accused, was a negro born in slavery, who became a citizen of the Cherokee Nation under the ninth article of the treaty of 1866. Duncan, the deceased, and alleged to have been murdered, was the illegitimate child of a Choctaw Indian, by a negro woman who was not his wife, but a slave in the Cherokee Nation. *Held,* that, for purposes of jurisdiction, Alberty must be treated as a member of the Cherokee Nation, but not an Indian, and Duncan as a colored citizen of the United States, and that, for the purposes of this case, the court below had jurisdiction.

A man who finds another, trying to obtain access to his wife's room in the night time, by opening a window, may not only remonstrate with him, but may employ such force as may be necessary to prevent his doing so; and if the other threatens to kill him, and makes a motion as if so to do,

and puts him in fear of his life, or of great bodily harm, he is not bound to retreat, but may use such force as is necessary to repel the assault.

The weight which a jury is entitled to give to the flight of a prisoner, immediately after the commission of a homicide, was carefully considered in *Hickory* v. *United States*, 160 U. S. 408; and, without repeating what was there said, it was especially misleading for the court in this case to charge the jury that, from the fact of absconding they might infer the fact of guilt, and that flight is a silent admission by the defendant that he is unable to face the case against him.

DEFENDANT, a Cherokee negro, who was known both by his father's name of Burns and that of his former master, Alberty, was convicted of the murder of one Phil Duncan, at the Cherokee Nation, in the Indian Territory. The indictment alleged the crime to have been committed May 15, 1879, but it appeared by the evidence to have been committed in 1880.

Upon judgment of death being pronounced, defendant sued out a writ of error from this court, assigning a want of jurisdiction in the court below and various errors in the charge to the jury connected with the law of homicide, and the inference to be drawn from the flight of the accused.

*Mr. William M. Cravens* for plaintiff in error.

*Mr. Assistant Attorney General Whitney* for defendants in error.

MR. JUSTICE BROWN delivered the opinion of the court.

1. The question of jurisdiction in this case demands a primary consideration. Although the prisoner Alberty was not a native Indian, but a negro born in slavery, it was not disputed that he became a citizen of the Cherokee Nation under the ninth article of the treaty of 1866, 14 Stat. 799, 801, by which the Cherokee Nation agreed to abolish slavery, and further agreed "that all freedmen who have been liberated by voluntary act of their former owners or by law, as well as all free colored persons who were in the country at the commencement of the rebellion and are now residents therein or who may return within six months, and their descendants, shall have all the rights of native Cherokees." While this article of the

.treaty gave him the rights of a native Cherokee, it did not, standing alone, make him an Indian within the meaning of Rev. Stat. § 2146, or absolve him from responsibility to the criminal laws of the United States, as was held in *United States v. Rogers,* 4 How. 567, 573, and *Westmoreland v. United States,* 155 U. S. 545.

Duncan, the deceased, was the illegitimate child of a Choctaw Indian, by a colored woman, who was not his wife, but a slave in the Cherokee Nation. As his mother was a negro slave, under the rule *partus sequitur ventrem,* he must be treated as a negro by birth, and not as a Choctaw Indian. There is an additional reason for this in the fact that he was an illegitimate child, and took the *status* of his mother. *Williamson v. Daniel,* 12 Wheat. 568; *Fowler v. Merrill,* 11 How. 375.

· He came, however, to the Cherokee Nation when he was about seventeen years of age, and married a freed woman, and a citizen of that Nation. It would seem, however, from such information as we have been able to obtain of the Cherokee laws, that such marriage would not confer upon him the rights and privileges of Cherokee citizenship, beyond that of residing and holding personal property in the Nation; that the courts of the Nation do not claim jurisdiction over such persons, either in criminal or civil suits, and they are not permitted to vote at any elections.

For the purposes of jurisdiction, then, Alberty must be treated as a member of the Cherokee Nation, but not an Indian; and Duncan as a colored citizen of the United States.

By Revised Statutes, § 2145, except as to certain crimes, " the general laws of the United States as to the punishment of crimes committed within the sole and exclusive jurisdiction of the United States, except the District of Columbia, shall extend to the Indian country; " and by § 2146, " the preceding section shall not be construed to extend to crimes committed by one Indian against the person or property of another Indian, nor to any Indian committing any offence in the Indian country who has been punished by the local law of the tribe; or to any case where, by treaty stipulations, the exclusive jurisdiction over such offences is or may be secured to the Indian

tribes respectively." Obviously this case is not within the first class, because the crime was not committed by one Indian against the person of another Indian; nor within the second class, because there was no evidence that Alberty had been punished by the local law of the tribe; and the only remaining question is whether, by treaty stipulations, the exclusive jurisdiction over this offence has been secured to the Cherokee tribe.

By article 13 of the Cherokee treaty of July 19, 1866, 14 Stat. 799–803, the establishment of a court of the United States in the Cherokee territory is provided for, "with such jurisdiction and organized in such manner as may be prescribed by law: *Provided,* That the judicial tribunals of the Nation shall be allowed to retain exclusive jurisdiction in all civil and criminal cases arising within their country in which members of the Nation, by nativity or adoption, shall be the *only parties,* or where the cause of action shall arise in the Cherokee Nation, except as otherwise provided in this treaty." It is admitted that the present case is not within the last exception.

By the act of May 2, 1890, c. 182, to provide a temporary government for the Territory of Oklahoma and to enlarge the jurisdiction of the United States court in the Indian Territory, 26 Stat. 81, it is provided, § 30, "that the judicial tribunals of the Indian Nations shall retain exclusive jurisdiction in all civil and criminal cases arising in the country in which members of the Nation, by nativity or by adoption, shall be the *only parties;*" and by § 31, that "nothing in this act shall be so construed as to deprive any of the courts of the civilized Nations of exclusive jurisdiction over all cases arising wherein members of said Nations, whether by treaty, blood or adoption, are the *sole parties;* nor so as to interfere with the right and power of said civilized Nations to punish said parties for violation of the statutes and laws enacted by their national councils, where such laws are not contrary to the treaties and laws of the United States."

It will be observed that while this act follows the treaty so far as recognizing the jurisdiction of the Cherokee Nation as to all cases arising in the country, in which members of the

Nation, by nativity or by adoption, are the sole or only parties, it omits that portion of the thirteenth article of the treaty, wherein is reserved to the judicial tribunals of the Nation exclusive jurisdiction " where the cause of action shall arise in the Cherokee Nation," and to that extent apparently supersedes the treaty.

. The real question as respects the jurisdiction in this case is as to the meaning of the words " sole " or only " parties." These words are obviously susceptible of two interpretations. They may mean a class of actions as to which there is but one party; but as these actions, if they exist at all, are very rare, it can hardly be supposed that Congress intended to legislate with respect to them to the exclusion of the much more numerous actions to which there are two parties. They may mean actions to which members of the Nations are the sole or only parties, to the exclusion of white men, or persons other than members of the Nation; and as respects civil cases at least, this seems the more probable construction.

But the difficulty is with regard to criminal cases, to which the defendant may be said to be the only party; and, if not, as to who is the other party, the sovereignty in whose name the prosecution is conducted — in this case, the United States, or the prosecuting witness, or, in a homicide case, the person who was killed. Some light is thrown upon this by the seventh article of the same treaty, wherein a special provision is made for the jurisdiction of the United States court to be created in the Indian Territory; and until such court was created therein, the United States District Court, nearest to the Cherokee Nation, was given " exclusive original jurisdiction of all cases, civil and criminal, wherein an inhabitant of the district hereinbefore described" (meaning the Canadian district of the Cherokee Nation) "shall be a party, and where an inhabitant outside of said district, in the Cherokee Nation, shall be the other party, as plaintiff or defendant in a civil cause, or shall be defendant or prosecutor in a criminal case." It is true that the homicide in this case was not committed within the Canadian district, and, therefore, that this seventh article has no direct application, but it has an indirect bear-

ing upon the thirteenth section as indicating an intention on the part of Congress to treat the prosecutor in a criminal case as the other party to the cause, and so long as the party injured is alive, it may be proper to speak of him as such; and this we understand to have been the construction generally given. While it is impossible to speak of the deceased in a murder case as a party, in any proper sense, to a criminal prosecution against his assailant, it can scarcely have been the intention of Congress to vest jurisdiction in the Federal courts of cases in which the accused, an Indian, was guilty of a felonious assault upon a white man, not resulting in death, and deny it in case of a fatal termination, upon the ground that the accused is the only party to the cause.

In construing these statutes in their application to criminal cases, and in connection with the treaty, there are but three alternative courses.

(1) To treat the defendant as the *sole* party; in which case the Indian courts would have jurisdiction, whether the victim of the crime were an Indian or a white man. In the *Case of Mayfield*, 141 U. S. 107, which was a case of adultery, in which the name of the prosecuting witness did not appear, we held that as there was no adverse party, the woman being a consenting party, the defendant was to be regarded as the sole party to the proceeding.

(2) To treat the United States as the *other* party to the cause; in which case the Federal courts would have jurisdiction of all criminal cases, except as they might be limited by the clause of Rev. Stat. § 2146, providing that such jurisdiction "shall not be construed to extend to crimes committed by one Indian against the person or property of another Indian."

(3) To treat the victim of the crime, whose person or property has been invaded, as the *other* party; in which case the Federal courts would have jurisdiction in all cases in which the victim was a white man, or other than an Indian. Under this construction the word "parties" would really mean parties to the crime and not simply to the prosecution of the crime.

The last proposition harmonizes better with what seems

to have been the intention of Congress, as evinced in that clause of Rev. Stat. § 2146 which reserves to the courts of the Nation jurisdiction of "crimes committed by one Indian against the person or property of another Indian," and at the same time avoids the anomaly of holding a murdered man to be a party to the prosecution of his slayer. Upon the whole we think it affords the most reasonable solution of the problem. For the purposes of this case, therefore, we hold the court below had jurisdiction.

There were a number of exceptions taken to the charge of the court, only two of which it will be necessary to discuss.

2. The eighth assignment of error is to the following instruction :

"When he" (the defendant) "is in that condition, if he was in that condition in this case, and was then attacked by Duncan, the deceased, in such a way as to denote an intention upon the part of the deceased to take away his, the defendant's, life, or to do him some enormous bodily injury, he could kill Duncan — when ? — provided he use all the means in his power otherwise to save his own life from the attack of Duncan, or preventing the intending harm, such as retreating as far as he could, or disabling his adversary without killing him. That is still a duty."

In the case of *Beard* v. *United States*, 158 U. S. 550, the doctrine of the necessity of retreating was considered by this court at very considerable length, and it was held, upon a review of the authorities upon the subject, that a man assailed upon his own premises, without provocation, by a person armed with a deadly weapon, and apparently seeking his life, is not obliged to retreat, but may stand his ground and defend himself with such means as are within his control ; and so long as there is no intent on his part to kill his antagonist, and no purpose of doing anything beyond what is necessary to save his own life, is not guilty of murder or manslaughter if death result to his antagonist from the blow given him under such circumstances. In delivering the opinion it was said, p. 559 :

"But we cannot agree that the accused was under any greater obligation, when on his own premises, near his dwell-

ing-house, to retreat or run away from his assailant, than he would have been if attacked within his dwelling-house. The accused being where he had a right to be, on his own premises, constituting a part of his residence and home, at the time the deceased approached him in a threatening manner, and not having by language or by conduct provoked the deceased to assault him, the question for the jury was whether, without fleeing from his adversary, he had, at the moment, he struck the deceased, reasonable grounds to believe, and in good faith believed, that he could not save his life or protect himself from great bodily harm except by doing what he did, namely, strike the deceased with his gun, and thus prevent his further advance upon him."

In the case under consideration it appeared that Duncan, the deceased, had been paying such attentions to the defendant's wife that it had caused them to separate, the wife living at a Mr. Lipe's, where the killing occurred, and defendant making his home with some colored people by the name of Graves. Defendant himself worked during the day at Lipe's, was frequently with his wife, and upon the evening in question had been to church with her and taken her home to Lipe's after the service. She went into the house and defendant went back into the lot, where the stock was, as it was a part of his duty to look after the stock. His version of the facts was that while he was in the lot he saw a window in the house, which opened into his wife's room, raised, walked out into the yard and found the deceased at the window, and said to him : " Who is that ? " To which the deceased replied, with an oath : " You will find out who it is ; " " and then made at me at that time. That is the first time I had seen him there. And then I knew his voice, and he made at me as if he had something and was going to kill me, and I had this little pistol in my pocket and I run backwards toward the front yard and told him to stand off, . . . and I called Mr. Lipe, who got up and came to the door and asked what was the matter ; " to which defendant replied : " This man here was trying to get up in your window where my wife sleeps . . . and then I moved away — I started to move and this fellow says

to me, he says, 'I will kill you, God damn you,' and made for me. He was between me and the house and I was next to the gate, and I broke for the gate to try to get out of his way, and as I broke for the gate he was coming at me, seemed like he was going to cut me with something; I couldn't tell what it was and I threw myself around that way (illustrating) and fired."

It was in this connection that the court gave the charge covered by the eighth assignment, adding thereto:

"If a man attacks us wrongfully, if he is seeking then and there to make an attack upon us in such a way as to jeopardize life, and we can turn aside that attack without destroying his life, it is our duty to do it. It is our duty, in the first place, to get out of the way of the attack, and that is a duty springing from our own self interest, because if a man can avoid a deadly result with due regard to his own safety, is it not better for him to do it, than to rush rashly into a conflict where he may lose his life? He is doing it in the interest of his own life. And then, aside from that, in the interest of the life of the party who attacks him, he is required to do it. Then, under this proposition, to give the defendant the benefit of it, he must have been doing what he had a right to do at the time, and while so situated he must have been attacked by Phil Duncan, the deceased, in such a way as to indicate, from the nature of that attack, and the way he was executing it, a purpose upon the part of Duncan then and there by that conduct to take his life, or to inflict upon him some great violence: and he must have been so situated, so surrounded by danger, that he could not get out of the way of it, or he could not turn it aside by an act of less violence than what he did do. He must have exercised reasonable means, in other words, to avoid the dreadful necessity of taking human life, because the law says that he could kill, provided he use all the means in his power otherwise to save his own life."

We think the charge of the court in this connection is open to the same objection that was made to the charge in the case of *Beard* v. *United States.* The only difference suggested is that in that case the attack was made with firearms, and in

this case it would appear that the defendant supposed that the deceased was about to attack him with a knife. Defendant, however, was working at Lipe's, where his wife was staying, and if, as he claims, he saw a man in the act of raising a window which led to his wife's room, it was perfectly natural that he should wish to investigate, and to ascertain for what purpose the man was there. It appears to have been so dark at the time that defendant did not recognize deceased except by his voice; that the deceased threatened, with an oath, to kill him, and as he says, "made for him" with a knife. Under such circumstances we think that a charge to the jury that he was bound to retreat as far as he could, or disable his adversary without killing him, was misleading. We think that a man who finds another trying to obtain access to his wife's room in the night time, by opening a window, may not only remonstrate with him, but may employ such force as may be necessary to prevent his doing so; and if the other threatens to kill him, and makes a motion as if to do so, and puts him in fear of his life, or of great bodily harm, he is not bound to retreat, but may use such force as is necessary to repel the assault. Of course it is not intended to intimate that these were the facts, but what the facts were was a question for the jury, who had a right to believe the defendant's version, if it seemed probable to them. Upon the assumption that the jury did believe him, we think the charge imposed upon the defendant a responsibility and duty which he could not justly be called upon to bear.

3. The fourteenth assignment of error was to the following instructions upon the subject of the flight of the accused after the homicide :

"You take into consideration, in other words, the facts and circumstances which led up to the killing, the facts and circumstances that transpired at the time of the killing, and you do not stop there, but you take into consideration the facts and circumstances as affecting the defendant subsequently to the killing. For instance, you take into consideration the defendant's flight from the country — his going into another part of the country — as evidence; and you are to pass upon the ques-

tion as to whether or not he has sufficiently explained away the presumption which the law says arises from flight when a man has taken human life. It is a principle of human nature — and every man is conscious of it, I apprehend — that if he does an act which he is conscious is wrong, his conduct will be along a certain line. He will pursue a certain course not in harmony with the conduct of a man who is conscious that he has done an act which is innocent, right and proper. The truth is — and it is an old scriptural adage — ' that the wicked flee when no man pursueth, but the righteous are as bold as a lion.' Men who are conscious of right have nothing to fear. They do not hesitate to confront a jury of their country, because that jury will protect them; it will shield them, and the more light there is let in upon their case the better it is for them. We are all conscious of that condition, and it is therefore a proposition of the law that, when a man flees, the fact that he does so may be taken against him, provided he does not explain it away upon some other theory than that of his flight because of his guilt.

" A man accused of crime hides himself, and then absconds. From this fact of absconding we may infer the fact of guilt. This is a presumption of fact, or an argument of a fact from a fact."

Again upon that subject:

. . . " flight by a defendant is always relevant evidence when offered by the prosecution; and that it is a silent admission by the defendant that he is unwilling or unable to face the case against him. It is in some sense, feeble or strong as the case may be, a confession; and it comes in with the other incidents, the *corpus delicti* being proved from which guilt may be cumulatively inferred."

" Now, that is the figure that flight cuts in a case. It is a question in this case whether this defendant has sufficiently explained it here to take away the effect of the presumption arising from flight."

In this connection the evidence tended to show that a day or two after the crime the defendant fled from the jurisdiction of the court, went to St. Louis, and there resumed his father's

name instead of that of his master, which he had previously borne. Defendant gave his reason for fleeing as follows: "My heart was broke, and I just did not care to stay; I thought I would just go away from the country where I would never hear from my people any more, because my heart was broke, and my children was all young and they had just commenced to love me, and my heart was broke at that time, and that was the reason I went away."

The weight which the jury is entitled to give to the flight of a prisoner immediately after the commission of a homicide was carefully considered by this court in the case of *Hickory* v. *United States*, 160 U. S. 408, in which a charge, substantially in the language of the instruction assigned as erroneous in this case, was held to be tantamount to saying to the jury that flight created a legal presumption of guilt so strong and so conclusive that it was the duty of the jury to act on it as axiomatic truth, and as such that it was error.

We do not find it necessary to repeat the argument that was made in that case, but we think it was especially misleading for the court to charge the jury that, from the fact of absconding, they might infer the fact of guilt, and that flight "is a silent admission by the defendant that he is unwilling or unable to face the case against him. It is in some sense, feeble or strong as the case may be, a confession; and it comes in with the other incidents, the *corpus delicti* being proved from which guilt may be cumulatively inferred." While undoubtedly the flight of the accused is a circumstance proper to be laid before the jury, as having a tendency to prove his guilt; at the same time, as was observed in *Ryan* v. *The People*, 79 N. Y. 593, "there are so many reasons for such conduct consistent with innocence, that it scarcely comes up to the standard of evidence tending to establish guilt, but this and similar evidence has been allowed upon the theory that the jury will give it such weight as it deserves, depending upon the surrounding circumstances."

While there is no objection to that part of the charge which permits the jury to take into consideration the defendant's flight from the country as evidence bearing upon the question of his

guilt, it is not universally true that a man, who is conscious that he has done a wrong, " will pursue a certain course not in harmony with the conduct of a man who is conscious of having done an act which is innocent, right and proper ; " since it is a matter of common knowledge that men who are entirely innocent do sometimes fly from the scene of a crime through fear of being apprehended as the guilty parties, or from an unwillingness to appear as witnesses. Nor is it true as an accepted axiom of criminal law that " the wicked flee when no man pursueth, but the righteous are as bold as a lion." Innocent men sometimes hesitate to confront a jury — not necessarily because they fear that the jury will not protect them, but because they do not wish their names to appear in connection with criminal acts, are humiliated at being obliged to incur the popular odium of an arrest and trial, or because they do not wish to be put to the annoyance or expense of defending themselves. The criticism to be made upon this charge is, that it lays too much stress upon the fact of flight, and allows the jury to infer that this fact alone is sufficient to create a presumption of guilt. It certainly would not be contended as a universal rule that the fact that a person, who chanced to be present on the scene of a murder, shortly thereafter left the city, would, in the absence of all other testimony, be sufficient in itself to justify his conviction of the murder.

We have found it impossible to reconcile these instructions with the rulings of this court in the two cases above cited, and are therefore compelled to

*Reverse the judgment of the court below, and remand the case with instructions to grant a new trial.*