**UNITED STATES of America,**
**Appellee,**

v.

**Wayne M. GREISER, Appellant.**

**UNITED STATES of America,**
**Appellee,**

v.

**Roderick J. MONTE, Jr.,**
**Appellant.**

**Nos. 74–1582, 74–1709.**

United States Court of Appeals,
Ninth Circuit.

Sept. 11, 1974.

**1296**

Dale L. States, Phoenix, Ariz., for appellants.

Ronald A. Lebowitz, Asst. U.S. Atty., Phoenix, Ariz., for appellee.

## OPINION

Before KOELSCH and KILKENNY, Circuit Judges, and SWEIGERT,* District Judge.

KILKENNY, Circuit Judge:

Each appellant was convicted in a jury trial of the crime of extortion in violation of 18 U.S.C. § 1951, and of the crime of aiding and abetting in violation of 18 U.S.C. § 2.

## FACTS

On May 12, 1972, at approximately 4:00 P.M., Armour Black, manager of a branch office of a national bank in Phoenix, received a telephone call from an unidentified caller, in which Black was told that " . . . this is a hold-up . . . ." He was then told that his wife was being held as a hostage, and that if he did what the caller indicated, nothing would happen to her. He was then directed to place twenty, fifty and one-hundred dollar bills in a brief case, and take the case across the street to a telephone booth in the Park-Central Shopping Center. Black was convinced of the validity of the threat and forthwith placed $20,500.00 in a black cardboard box and proceeded to cross the street. As Black was crossing the street, he saw a "hippie-type" man with long hair, blue jeans, a beard, a mustache, and a T-shirt. This man was later identified as appellant Monte.

When Black reached the phone booth, he placed the box on a ledge and put a dime in the telephone slot. At this moment, a man came from behind and instructed Black to hand over the box, which he did. On turning around, he recognized the man as the same "hippie-type" person he had just observed. The man remarked, "I told you not to turn around.", forthwith took the box, walked away and turned down the center of the Park-Central Mall.

Shortly thereafter, the Federal Bureau of Investigation was notified and its agents proceeded to search the shopping center area where the box had been taken from Black, and there found two yellow legal size pieces of paper on which were drawn a map of the shopping center area and the location of the telephone booth to which Black had been directed. These pieces of paper had several handwritten notations, one of which was the telephone number registered to the Granada Royale Hometel, with room extension numbers 135 and 136. Black's name, home address and home and business telephone numbers were noted on one of the yellow sheets. The agents

---

* The Honorable William T. Sweigert, United States District Judge for the Northern District of California, sitting by designation.

immediately proceeded to the Hometel and observed Monte leaving in an automobile. He fit the description given to the agents by Black of the "hippie-type" person whom Black had observed in the shopping center, with the exception of the beard. However, the officers observed a noticeable difference between the coloration on his face above the cheek bones and the coloration on his cheeks. This indicated to them that he had recently shaven. The officers proceeded to arrest Monte. A search of his automobile revealed the remnants of the black cardboard box. A search of his hotel room, number 135, pursuant to a search warrant, resulted in the discovery in the freezing compartment of his room refrigerator, $4,270.00 in five, ten and twenty dollar bills.

The following morning the local newspaper ran the story of the incident along with a photograph of Monte. Black immediately recognized the man in the photograph as the one who took the money from him the previous day.

A check of the hotel records revealed that three calls were placed from room 136, and that the room was registered to a Helen Greiser. These calls were placed to the business and residence phones of Peter Bagnard in the Los Angeles area. As part of the investigation, an agent secured from American Airlines, in Phoenix, boarding passes, tickets and ticket folders for two people named Greiser on a flight to Los Angeles in the early evening of May 12, 1972. That evening, Stephanie, wife of Peter, received a call advising that Greiser was arriving at Los Angeles Airport and suggesting that her husband should meet the plane. Greiser, Bagnard and Judy McNelis, sister of Nancy Monte, later arrived at Bagnard's house. Shortly, thereafter, Greiser handed Bagnard 50 one-hundred dollar bills to pay for construction work on a racing car. Soon thereafter, Bagnard answered the telephone and a female voice asked for Greiser. After a telephone conversation, Greiser appeared very upset, privately conferred with Judy and then said that

they were going to a motel rather than stay overnight with the Bagnards. He said that he had run into some difficulties, but that it was nothing that he could not handle. He mentioned that a friend of his had just been "busted" for a marihuana charge, and that a bank robbery was included. The following day, he asked Bagnard for and received a return of $2,000.00. He then bought a Lincoln Continental automobile. Just before leaving, he told Bagnard that if anyone was looking for him to tell them that he had been there, but not to tell them anything about their business transaction.

On May 18, 1972, a Texas Highway Patrolman stopped Greiser and Judy on Interstate 10 in Texas. Greiser displayed a temporary driver's license in the name of "Dridka". The officer, being unaware that "Dridka" was in fact Greiser, permitted him to proceed. In a short time, the patrolman received a radio dispatch on the vehicle and started in pursuit of the Greiser Continental. When the vehicle was stopped, the officer discovered in Judy's purse two cigarette packages which contained 16 one-hundred dollar bills; also a bill of sale for the automobile.

Both appellants' fingerprints were found on the following: (1) in fragments of the black cardboard box found at the Granada Royale, and (2) the yellow notes discovered at Park-Central Mall. The manager of the Hometel positively identified Greiser as the man who signed the Hometel registration card for room 136.

## THE MONTE APPEAL

Monte's only defense was that of insanity. The defense was rejected by the jury. His single assignment of error is the alleged misconduct of the prosecutor. During the course of the examination of one of appellant's psychiatrists, the prosecutor asked the witness if he was aware " . . . of the limitations of the federal court on institutionalization of mentally affected individuals."

There was an immediate objection by Monte's counsel. The court forthwith sustained the objection, and after a motion for mistrial, instructed the jury to disregard the question.[1]

Appellant's reliance on *Evalt v. United States*, 359 F.2d 534, 546 (CA9 1966), is misplaced. There the prosecutor, in substance, argued to the members of the jury that they might find the defendant guilty even though they believed him to be insane. While in *Evalt*, the prosecutor was permitted to argue that the defendant might go free unless the jury found him guilty, here the judge sustained the objection to the question and instructed the jury to disregard it.

■ *United States v. McCracken*, 488 F.2d 406 (CA5 1974), cited by appellant, is no more in point. There, the trial judge committed the grievous error of telling the jury that a defendant charged with murder would be released if found not guilty by reason of insanity. Here, to the contrary, the judge removed from the consideration of the jury the consequences of its verdict. Any possible error was remedied by the court's instructions.

■ Aside from the above, the evidence against Monte is so overwhelming that we would not hesitate to invoke the harmless error doctrine as stated in *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969), and *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), and their progeny.

### THE GREISER APPEAL

Greiser assigns two errors: (I) the action of the trial court in receiving evidence with reference to the handwriting of the appellant, and (II) the giving of an instruction on flight.

### I.

During the course of the trial, various writings were admitted in evidence un-der the Business Records Act, 28 U.S.C. § 1732. These instruments were in the handwriting of Greiser or persons purporting to be Greiser. Two of the writings were hotel registration cards at the El Camino Village Motel. The operators of the motel positively identified appellant as the person who filled out each registration card on two separate visits. The handwriting on certain employment applications was identified as that of the appellant by a fellow employee. This witness testified that he was familar with appellant's writing and printing and that he recognized the exhibits as the handwriting or handprinting of appellant even though the name of the appellant did not appear on the particular writings. Additionally, an FBI agent, an expert in handwriting analysis, compared the known exemplars with the yellow notes found at the scene of the crime, and testified that the handprinting on the yellow sheets was handprinted by the person who printed the known examplars.

■ The great weight of authority places on the trial judge the burden of determining the genuineness of the handwriting on the documents to be used as a standard. *United States v. American Radiator & Stand. San. Corp.*, 433 F.2d 174, 193 (CA3 1970), cert. denied 401 U.S. 948, 91 S.Ct. 928, 28 L. Ed.2d 231 (1971). Here the judge, at least by strong implication, ruled that the exemplars were sufficient and submitted them to the jury under proper instructions.

■■ Appellant's attack is directed more to the sufficiency of the evidence relating to his handwriting than to the procedure which was followed in submitting this issue to the jury. In any event, our examination of the record convinces us that the evidence of the expert and of the other witnesses was adequate to permit the introduction of the writings in evidence. 28 U.S.C. § 1731

---

1. "THE COURT: . . . Any reference in the testimony to penalties is to be entirely disregarded by the jury, you are not to con-sider it at all. Punishment is for the Court to determine, not for the jury." [Page 245, Monte Transcript].

and our own authorities support this conclusion. United States v. Saputski, 496 F.2d 140 (CA9 1974); Robles v. United States, 279 F.2d 401 (CA9 1960), cert. denied 365 U.S. 836, 81 S.Ct. 750, 5 L.Ed.2d 745, rehearing denied 365 U.S. 890, 81 S.Ct. 1032, 6 L.Ed.2d 201 (1961); Desimone v. United States, 227 F.2d 864 (CA9 1955). The Business Records Act, 28 U.S.C. § 1732, was properly used as an additional ground for the introduction of the motel registration cards. United States v. Reed, 439 F.2d 1, 3 (CA2 1971). For comparison, see proposed Rules of Evidence for United States Courts and Magistrates, 56 F. R.D. 183, 331–332 (1972).

## II.

Next, Greiser challenges both the sufficiency of the evidence on flight and the legal accuracy of the flight instruction. He is wrong on both contentions.

There is substantial evidence that appellant: (1) was registered in room 136 of the Hometel at the time of the extortion; (2) occupied the room adjoining the room of appellant Monte; (3) placed or caused to be placed three telephone calls to the home of his friend in the Los Angeles area shortly after the occurrence; (4) notified or caused to be notified his friend Peter Bagnard of his arrival at the International Airport at a specific time that evening; (5) arrived at the Los Angeles airport from Phoenix at approximately 11:00 P.M. and was driven by his friend to the latter's home; (6) shortly thereafter handed his friend 50 one-hundred dollar bills, none of which denomination was found with Monte; (7) after a telephone conversation appeared upset and announced that he and his girl friend were going to a motel, rather than stay overnight with his friend; (8) the following day asked for and received from his friend a return of $2,000.00 in one-hundred dollar bills, forthwith bought the Continental and took off for parts unknown; (9) was next observed when stopped by a highway patrolman in Hudspeth County, Texas, on May 18, 1972, in the Continental purchased in Los Angeles. At that time, he displayed a temporary driver's license in the name of "Dridka"; (10) was then stopped by another patrolman after an exchange of radio dispatches. With him at both stops was Judy McNelis, in whose purse were found 16 one-hundred dollar bills.

The admissibility of evidence relating to flight is no longer open to question. In Marcoux v. United States, 405 F.2d 719, 721 (CA9 1968), we said:

"It is today universally conceded that the fact of an *accused's flight*, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself." [Emphasis supplied].

Additionally, the possession of a large sum of money in cash immediately after the extortion is relevant on the issue. United States v. Sidman, 470 F.2d 1158, 1163 (CA9 1972); United States v. Michaelson, 453 F.2d 1248, 1249 (CA9 1972).

Appellant's reliance on Alberty v. United States, 162 U.S. 499, 510–511, 16 S.Ct. 864, 40 L.Ed. 1051 (1896), and Hickory v. United States, 160 U.S. 408, 417, 16 S.Ct. 327, 40 L.Ed. 474 (1896), places him in the uncomfortable position of explaining away the subsequent Supreme Court decision of Allen v. United States, 164 U.S. 492, 499, 17 S.Ct. 154, 157, 41 L.Ed. 528 (1896), which analyzed the factual backgrounds in *Alberty* and *Hickory* and then went on to say, " . . . Indeed the law is entirely well settled that the flight of the accused is competent evidence against him as having a tendency to establish his guilt."

If appellant had taken the time to compare the instruction in Austin v. United States, 134 U.S.App.D.C. 259, 414 F.2d 1155 (1969), with the instruction before us, he would have found that following the *Austin* decision, the Devitt-Blackmar suggested instruction on flight, § 11–18, 2d Ed., Vol. 1, p. 234,

was revised to conform to *Austin* and that the instruction before us follows the revision.

### CONCLUSION

When we add to the evidence on flight, the large number of one-hundred dollar bills in appellant's possession, his fingerprints on the yellow papers, his handwriting on the same documents, his registrations at the motel and Hometel, his close relationship with the appellant Monte, and other relevant evidence, there is no doubt in our minds but that the record reveals substantial evidence of appellant's guilt and that his case was properly submitted to the jury.

Finding no error, we affirm the judgments of the lower court.