**UNITED STATES of America, Plaintiff,**

v.

**Robert Franklin DUFFY, Defendant.**

**No. 3–92 CR 22.**

United States District Court,
D. Minnesota,
Third Division.

July 7, 1992.

Joseph Walbran, Asst. U.S. Atty., Minneapolis, Minn., for plaintiff.

Daniel M. Mohs, Minneapolis, Minn., for defendant.

## ORDER

ALSOP, District Judge.

The above-entitled matter comes before the court upon the report and recommendation of United States Magistrate Judge Franklin L. Noel dated June 26, 1992. In that report and recommendation, the magistrate judge recommended the following with reference to motions filed by defendant Duffy:

1. Defendant's motion to suppress evidence be GRANTED to the extent that defendant seeks to suppress evidence seized from his person but that defendant's motion to suppress evidence be DENIED to the extent that defendant seeks to suppress the contents of the discarded athletic bag;

2. Defendant's motion to suppress statements be GRANTED.

The United States has filed timely objections to the magistrate judge's report and recommendation. The court has made a *de novo* review of the facts and the legal issues presented pursuant to 28 U.S.C. § 636(b) and LR 72.1.

As part of that review, the court has read the transcript of the proceedings conducted before the magistrate judge on May 13, 1992, reviewed all exhibits introduced as a part of that proceeding, and has read and considered the government's memorandum and supplemental memorandum submitted in support of its objections to the magistrate judge's report and recommendation.

Based upon its *de novo* review, the court finds that the magistrate judge has set forth the facts solicited from the testimony taken at the hearing succinctly. The court concurs in the magistrate judge's factual

findings and also agrees with the legal analysis made by the magistrate judge.

Accordingly, based upon the report and recommendation of the magistrate judge, and all files, records, and proceedings herein,

IT IS ORDERED That:

1. Defendant's motion to suppress evidence is GRANTED to the extent that defendant seeks to suppress evidence seized from his person but that defendant's motion to suppress evidence is DENIED to the extent that defendant seeks to suppress the contents of the discarded athletic bag;

2. Defendant's motion to suppress statements is GRANTED.

## REPORT & RECOMMENDATION

NOEL, United States Magistrate Judge.

This matter was before the undersigned United States Magistrate Judge for a hearing on May 13, 1992 on defendant's motion to suppress evidence and statements. Defendant was present and was represented by Daniel M. Mohs, Esq. Plaintiff was represented by Assistant United States Attorney Joseph Walbran.

Defendant is charged with possessing with intent to distribute 182.6 grams of crack cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A) and with possession of 68.9 grams of a substance containing cocaine. Drugs were found on defendant's person after defendant was apprehended and searched. Drugs were also found in an athletic bag which defendant allegedly abandoned during the chase leading to his arrest. Defendant claims that his arrest was illegal and he moves to suppress evidence and his post-arrest statements, claiming they are the fruit of his illegal arrest.

At the hearing the court heard the testimony of St. Paul Police Sgt. James Jerylo, St. Paul Police Officer Michael Findley and St. Paul Police Officer James Falkowski. Government Exhibits 1–3 were received

into evidence. For the reasons set forth in this opinion, the court will recommend that defendant's motion to suppress evidence found on defendant's person and defendant's motion to suppress statements be granted but that defendant's motion to suppress evidence found in the discarded athletic bag be denied.

### I. *Factual Background*

Sgt. Jerylo testified that he was on duty at the St. Paul bus depot looking for drug couriers early in the morning on February 19, 1992. Sgt. Jerylo was in plain clothes, was neatly dressed and was well groomed. Sgt. Jerylo is approximately 50 years old and is a relatively large man.

At about 6:10 a.m. Sgt. Jerylo observed defendant, a black male in his early twenties, get off a bus that had come from Chicago. Sgt. Jerylo was about 20 feet from the bus exit and made eye contact with defendant when defendant walked off the bus platform. Defendant carried with him an athletic bag.

Sgt. Jerylo watched the defendant turn left and then walk around the east side of the depot, heading toward 7th Street. *See* Government Exhibit 3 (hand drawn map of bus depot). Sgt. Jerylo, acting upon a hunch that defendant might be a drug courier, followed 20 feet behind defendant as defendant was walking around the east side of the depot.[1] While following defendant, Sgt. Jerylo pulled out his badge and in a normal tone of voice asked defendant if he could talk to him. Defendant looked behind at Sgt. Jerylo, made eye contact with him and then took off running south on Wabasha, leaving Sgt. Jerylo behind.

At this point Sgt. Jerylo gave chase but lost site of defendant at 6th and Wabasha. *See* Government Exhibit 1 (map of St. Paul which displays chase route). Two citizens told Jerylo that they had seen defendant. A woman saw defendant as he ran east on 6th Street and a man at 6th and St. Peter saw defendant running toward the St. Paul Companies building, which is east of the intersection of 6th and St. Peter. Jerylo

---

1. The government concedes that Sgt. Jerylo lacked sufficient information to make an investigatory stop when Sgt. Jerylo first approached defendant to ask him questions.

called for backup and gave the dispatcher defendant's clothing description and defendant's general direction of flight.

St. Paul Police Officer Michael Findley testified that he heard over the radio that Sgt. Jerylo was pursuing a suspect and went to the general area in his squad car. He was on Washington Avenue, driving south (Landmark Center was on the left and the St. Paul Companies building on the right) when he spotted defendant running south on the left side of the street. Officer Findley caught up to defendant, rolled down his window and ordered defendant to stop. Defendant was not carrying the athletic bag when Officer Findley spotted him. Officer Findley noticed that defendant's right hand was in his right jacket pocket but he could not see defendant's left hand. Officer Findley ordered defendant to put up his hands. Defendant did not obey this order and continued to run.

When defendant approached the intersection of Washington Avenue and 5th Street, defendant rounded the corner and continued to run east on 5th Street. Officer James Falkowski testified that he and his partner, Officer Parsons, were in their squad car at the intersection of 5th and Market when they spotted defendant, with his right hand in his pocket, running in their general direction. Officer Falkowski testified that he exited the car and with his weapon drawn, he ordered defendant to get on the ground and raise his hands above his head. Defendant did not obey this order.

Officers Falkowski, Parsons and Findley surrounded defendant with their weapons drawn and tackled defendant to the ground. Officer Findley testified that defendant placed his left hand under his body once he was on the ground so they had to wrestle with defendant in order to cuff him. He testified that it took about 30–45 seconds to cuff defendant because defendant continued to struggle.

At this point Sgt. Jerylo arrived and asked the arresting officers if they had recovered the athletic bag. Immediately upon learning that defendant did not have the bag, Sgt. Jerylo and Officer Findley left the scene to search for the bag. They found the bag a few minutes later behind a dumpster near the Landmark Center. It was found about 2½ minutes after one of the other officers had notified the dispatcher that they had arrested the suspect. The bag contained crack cocaine, scales and miscellaneous drug paraphernalia.

Officer Falkowski testified that after Sgt. Jerylo and Officer Findley left the scene, Officers Falkowski and Parsons got defendant to his feet, took him to their squad car, put him against the car, spread his legs apart and Officer Parsons frisked defendant. Officer Parsons also searched the pocket where defendant's hand had been because the officers believed that defendant may have a concealed weapon. Inside the pocket was a bag containing material which was later determined to be cocaine.

Officers Falkowski and Parsons placed defendant in their squad car and transported him to jail. Defendant made spontaneous statements to the officers while he was in the squad car.

## II. *Analysis*

A. *The evidence found on defendant's person must be suppressed as the fruit of an illegal arrest but the evidence contained in the discarded athletic bag is admissible.*

 The drugs seized from defendant's pocket were found pursuant to a search made incident to defendant's arrest, after defendant was tackled to the ground, handcuffed and subjected to a search incident to his arrest. As the arrest was made without probable cause, the evidence must be suppressed.

The government concedes that when Sgt. Jerylo first approached the defendant, he had no reason to detain him. Jerylo simply wanted to ask defendant some questions. The government recognizes that defendant was not obligated to answer Sgt. Jerylo's questions. When defendant chose to ignore Sgt. Jerylo's request to engage in conversation by running away, Sgt. Jerylo gave chase and escalated a lawful attempt

to conduct an interview into an unlawful arrest.

When officers Findley and Falkowski ordered defendant to stop and ultimately arrested him by the use of force, they were acting only upon Jerylo's request for assistance. As Sgt. Jerylo had no probable cause to order the arrest, the orders given by Findley and Falkowski and their arrest of the defendant were without probable cause and were therefore unlawful. *Whiteley v. Warden,* 401 U.S. 560, 568, 91 S.Ct. 1031, 1037, 28 L.Ed.2d 306 (1971) (arrest made in response to radio broadcast is valid only if the officer initiating the broadcast had probable cause). The fruits of the unlawful arrest must be suppressed.

Although recent Supreme Court opinions have fundamentally changed the analysis of the Fourth Amendment in many ways, the Court expressly continues to articulate the general principle that the fruits of an illegal arrest must be suppressed. In *Florida v. Bostick,* —— U.S. ——, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) the court began its analysis of the Fourth Amendment issue by observing that if an encounter between Bostick and a policeman, on a bus, constituted a "seizure" and not a consensual encounter, then "the drugs found in Bostick's suitcase must be suppressed as tainted fruit." *Id.* 111 S.Ct. at 2386. Based upon the record, the court concluded that it had insufficient facts to determine whether a seizure occurred and remanded the case so the Florida courts could consider all relevant facts using the totality of the circumstances analysis. *Id.* at 2388.

Likewise, in *California v. Hodari D.,* —— U.S. ——, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991) the court began its Fourth Amendment analysis from the proposition that if Hodari D. was "seized" when the police gave chase, then the evidence discarded during the chase was tainted fruit and must be suppressed. *Id.* 111 S.Ct. at 1549. Indeed, the facts here are identical to a hypothetical posited by the dissent in *Hodari D.* In *Hodari D.* officers gave chase to several young men who fled upon the mere sighting of police officers. Hodari D. dropped a cocaine rock during the ensuing

chase which was later recovered by one of the officers. The State conceded that the officers did not have reasonable suspicion to justify stopping Hodari D. Thus, the sole issue before the Court was whether, at the time Hodari D. dropped the cocaine rock, he had been seized within the meaning of the Fourth Amendment. The Court found that Hodari D. was not seized until he was tackled, reasoning that the seizure of a fleeing suspect begins, and thereby the Fourth Amendment attaches, when the suspect submits to the official show of authority. The Court held the drugs to be admissible against Hodari D. as they were discarded before Hodari was seized and before the Fourth Amendment had attached. *See Hodari D.,* 111 S.Ct. at 1551–52.

In criticizing the court's decision that the Fourth Amendment does not apply to an attempted but unsuccessful unlawful seizure of a fleeing suspect, the dissenting Justices noted:

> In the present case, if [the officer] had succeeded in tackling respondent before he had dropped the rock of cocaine, the rock unquestionably would have been excluded as the fruit of the officer's unlawful seizure.

111 S.Ct. at 1561 (Stevens, J., dissenting). The majority does not quarrel with this legal analysis of the hypothetical facts, and indeed seems to embrace it. In an express reference to this portion of the dissent, the *Hodari D.* majority writes:

> Unlawful orders will not be deterred, moreover, by sanctioning through the exclusionary rule those of them that are *not* obeyed. Since policemen do not command "Stop!" expecting to be ignored, or give chase hoping to be outrun, it fully suffices to apply the deterrent to their genuine successful seizures.

*Id.* at 1551 (emphasis in original).

■ Here the police made a genuine, successful seizure of defendant (indeed, a full custodial arrest) before finding any evidence. As the arrest was without probable cause, following the reasoning of *Hodari D.,* the deterrent of the exclusionary rule must be applied to the evidence found

in defendant's pocket after he was arrested.[2] The drugs found in the discarded athletic bag, however, are admissible because like the rock of cocaine discarded in *Hodari D.*, they are not the product of an unlawful arrest. As the athletic bag was discarded before the arrest occurred, the facts as to it are indistinguishable from the facts in *Hodari D.* and the drugs found therein are admissible.

**B.** *Defendant's flight in this case does not amount to the "reasonable suspicion" needed to justify an investigatory detention.*

■ The government argues that defendant's flight upon being approached by Sgt. Jerylo gave the police reasonable suspicion to stop and detain defendant for a brief period in order to assess what was going on.

Reasonable suspicion to stop and detain a suspect for investigatory questioning must be based on "specific and articulable facts". *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968). The court must consider the facts in the context of the totality of the circumstances and also consider them in light of the significance that a law enforcement officer experienced in detecting criminal activity would attach to them. *See U.S. v. Turpin,* 920 F.2d 1377, 1385 (8th Cir.1990).

The government concedes that Sgt. Jerylo had no reasonable suspicion to detain defendant at the time Sgt. Jerylo initially approached defendant outside the bus depot. The government argues that defendant's flight, upon being approached by Sgt. Jerylo, gives rise to a reasonable suspicion that defendant was involved in criminal activity.[3] Although Sgt. Jerylo testified that when defendant fled he thought that defendant was a drug courier trying to evade police contact, there is no evidence in the record which would raise Sgt. Jerylo's thought above the level of a "hunch".[4] A hunch does not constitute an objective and articulable fact needed to justify a *Terry* stop. *Terry v. Ohio,* 392 U.S. 1, 21–22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968) (an investigative detention must be based on objective factors that the person is presently engaged in criminal activity; anything less would invite investigatory detentions upon not more than inarticulate hunches); *See also Brown v. Texas,* 443 U.S. 47, 51,

**2.** The government argues that defendant's arrest and the discovery of drugs on defendant's person would have been inevitable upon discovery of the contents of the athletic bag that had been discarded by defendant during the chase. The government's position is without merit. The discovery of the bag and its contents by Sgt. Jerylo occurred *after* defendant had been arrested by the officers. Because the officers had no probable cause to seize defendant while they were looking for the bag, it does not follow that defendant's arrest and the discovery of drugs on defendant's person would have been inevitable upon the officer's finding the bag. *See, e.g., Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979) (police may not seek to verify their suspicions by means that approach conditions of arrest).

**3.** Although the government cites several other facts known to Jerylo when he gave chase none of them either separately or combined create a reasonable suspicion that defendant was carrying drugs, and the court attaches no significance to them. For example, the government says it had tips that drug couriers were using buses, which came through Chicago, to avoid the interdiction efforts at the airport. Police had no information that drugs were being carried on this bus, and no information about the defendant. Indeed Jerylo did not know where defendant had even boarded this bus. The government also points out defendant walked around the east end of the depot, bypassing the taxis on the west end and the telephones inside. The only reasonable inference from this fact is that defendant did not need a cab and did not need to make a phone call.

**4.** The government also relies heavily on the defendant's refusal to comply with the police orders that he stop. This reliance is misplaced. It was the police who escalated Jerylo's attempt to conduct a consensual interview into a full custodial arrest. As noted above since Jerylo did not have any justification for stopping defendant when he gave chase, the orders of Falkowski and Findley were likewise without probable cause or reasonable suspicion. The defendant's failure to comply with these unlawful commands cannot transform Jerylo's hunch into a justification to make an arrest. As the Supreme Court observed in *Wong Sun,* while commenting on the significance of Toy's flight down the hallway, a vague suspicion cannot be transformed into probable cause for arrest by reason of ambiguous conduct which the arresting officers themselves provoke. *Wong Sun, infra,* 371 U.S. at 484, 83 S.Ct. at 415.

99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979) (to detain a person on the basis of reasonable suspicion, the officer must also have objective information linking the person to criminal activity).

This court rejects the government's contention that defendant's flight in this case justified an investigatory detention. Justice Scalia, citing the Proverb "the wicked flee when no man pursueth", suggests in *Hodari D.* that it "contradicts proverbial common sense" to find it unreasonable to stop young men who scatter in panic upon the mere sighting of police. *See Hodari D.*, 111 S.Ct. at 1549 n. 1. This observation is mere dictum without the force of law. Indeed, Justice Scalia expressly states that the Court was not deciding whether the officers had reasonable suspicion to chase Hodari D. because the Court relied on the State's concession that the officers did not have reasonable suspicion to chase and seize Hodari D. *Id.*

Moreover, the Supreme Court itself has repeatedly expressly rejected, as an axiom of criminal law, the Proverb upon which Justice Scalia's dictum is based. Almost 100 years ago the Court reversed a murder conviction because the trial court's jury instruction overly emphasized the significance of the defendant's flight. *Alberty v. United States*, 162 U.S. 499, 511, 16 S.Ct. 864, 868, 40 L.Ed. 1051 (1896). In *Alberty*, the Court recognized many reasons why an innocent man might flee from the law, including fear of being wrongly apprehended as a guilty party or because they do not wish to be put to the annoyance or expense of defending themselves. *Id.*

More recently in *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), acting on a tip from an informant whose reliability was untested, a narcotics agent went to a laundry operated by James Toy. The agent first told Toy he was there to pickup some dry cleaning. When Toy suggested the agent return in two hours, after the store was open, the agent identified himself as a federal agent.

Toy slammed the door shut and ran down a hallway to his living quarters. The agent gave chase and arrested Toy in his bedroom. The Supreme Court held that Toy's flight down the hallway after a narcotics officer identified himself did not give the police probable cause to arrest Toy. Before quoting from *Alberty's* express rejection of the quoted Proverb, the *Wong Sun* Court wrote:

"Although the question presented here is only whether the petitioner's flight justified an inference of guilt sufficient to generate probable cause for his arrest, and not whether his flight would serve to corroborate proof of his guilt at trial, the two questions are inescapably related. Thus it is relevant to the present case that we have consistently doubted the probative value in criminal trials of evidence that the accused fled the scene of an actual or supposed crime."

*Id.* 371 U.S. at 483 n. 10, 83 S.Ct. at 415 n. 10. The Court concluded that:

"Toy's refusal to admit the officers and his flight down the hallway thus signified a guilty knowledge no more clearly than did a natural desire to repel an apparently unauthorized intrusion."

*Id.* at 487, 83 S.Ct. at 417.

Here as in *Alberty* and *Wong Sun*, defendant's flight does not warrant the inference that he was engaged in criminal conduct. First, the record here is not entirely clear that defendant knew Jerylo was a police officer, when defendant began to run. Defendant got off the bus at 6:10 a.m. Jerylo, who was in plain clothes, made eye contact with defendant as he got off the bus. Jerylo followed defendant as he walked around the bus depot. From about 20 feet behind defendant, Jerylo spoke. He said nothing to identify himself as a police officer but raised his badge in the air. The sun had not yet risen.[5] Defendant again made eye contact with Jerylo, a large white man in plain clothes, and began to run. The court cannot conclude from these ambiguous facts, (nor was it

---

5. The sun did not rise on February 19, 1992, in St. Paul until 7:08 a.m. *United States Nautical Almanac Office, Sunrise Sunset Tables for Key Cities and Weather Statistics of the United States.* (Gale Research, 1977).

reasonable for Jerylo to infer from them) that defendant knew Jerylo was a police officer and fled because defendant was carrying drugs. It is just as reasonable to infer from these facts that defendant was fleeing from a possible assailant who had eyed him getting off the bus, and for reasons, unknown to defendant, was now stalking him as he walked away from the bus depot in the waning hours of morning darkness. Contrary to the government's contention, defendant's flight did not give Jerylo the reasonable articulable suspicion he needed to conduct a *Terry* stop.

Second, even if the court were to conclude that defendant knew Jerylo was a policeman, (a conclusion not justified by this record), his flight, alone, does not give rise to a reasonable suspicion that he was committing a crime. As noted above the Supreme Court has repeatedly rejected the notion that it is reasonable to infer guilt from nothing more than a suspect's flight either from a crime scene or a pursuing police officer. *Alberty, supra, Wong Sun, supra.* Here, Jerylo had no information that drugs were being carried on the bus in which defendant travelled, had no information that defendant or anyone fitting his description, was transporting drugs to St. Paul, and had no reason to believe that defendant was committing any other crime. Under these circumstances, it is unreasonable to infer that defendant was involved in a specific criminal activity, just because he fled without apparent reason, from a policeman. As the Supreme Court recognized in *Alberty* innocent people may flee simply because they do not want to be put to the trouble and expense of defending themselves. Moreover, as Justice Stevens noted in his *Hodari D.* dissent, at least one commentator has observed that young black men often seek to avoid contact with the criminal justice system due to their perception, whether justified or not, that the system, including the police, treat black people unfairly. *See Hodari D.,* 111 S.Ct. at 1553,

n. 4 (Stevens, J. dissenting) *citing* Johnson, "Race and the Decision to Detain a Suspect," 93 *Yale L.J.* 214 (1983). Even assuming that defendant knew Jerylo was a policeman, it is just as reasonable to infer that he fled simply to avoid the annoyance and trouble of needlessly having to explain himself to a curious policeman, as it is to conclude that defendant is a drug courier in possession of drugs. Consequently, it was unreasonable for Jerylo to escalate the defendant's flight into a custodial arrest because the flight alone did not constitute the reasonable suspicion needed to justify a *Terry* stop, even if the court were to find that defendant knew Jerylo was a policeman.[6]

The government's reliance on *United States v. Turpin,* 920 F.2d 1377 (8th Cir. 1990), *United States v. Jackson,* 741 F.2d 223 (8th Cir.1984) and *United States v. Silva,* 957 F.2d 157 (5th Cir.1992) is misplaced.

In *Turpin* and *Silva,* the issue was whether the police had reasonable suspicion to detain the suspect at the time the police initially approached the suspect. In both of these cases the suspect's attempt to thwart police contact was only one of the factors giving rise to reasonable suspicion. *See Turpin,* 920 F.2d at 1384–85 (change of direction to avoid checkpoint where officer and dog stationed, subsequent erratic behavior and bulge in pants justified *Terry* stop); *Silva,* 957 F.2d at 160–61 (being in company of known felon and subsequent flight from police gave rise to reasonable suspicion). In this case the government concedes that Sgt. Jerylo had no reasonable suspicion to detain defendant *before* he initially approached defendant outside the St. Paul bus depot. Moreover, while *Turpin* and *Silva* hold that flight may be a key ingredient in justifying a law enforcement officer to take action, they do not hold that flight, by itself, justifies a *Terry* stop, as the government argues in this case.[7]

**6.** As noted above such a finding is simply not justified by the record here.

**7.** Indeed, in discussing the relevance of flight in the reasonable suspicion calculation, the *Silva*

court notes that flight alone may never give rise to probable cause that the fleeing suspect is more likely than not involved in criminal activity. *See Silva,* 957 F.2d at 160.

■ *Jackson* is also distinguishable on its facts. In *Jackson,* two young men fled when a marked police cruiser approached them in an alley. The court held that the police had reasonable articulable suspicion to pursue the men when Jackson's companion shouted to him, "Its the police, man, run". *See Jackson,* 741 F.2d at 224. Under these circumstances it is reasonable to infer that the two men were together engaged in some illegal activity in the alley. For the reasons discussed above, the same inference does not arise when a lone young man elects to run away from a larger man in plain clothes who was stalking him as he left a bus depot before dawn. Indeed, none of the cases relied upon by the government address the precise issue present in this case, which is whether reasonable suspicion of specific criminal activity is properly aroused solely because an officer's request to speak to a person during a consensual encounter is refused in the form of flight.[8]

Also distinguishing this case from the cases cited by the government is that the defendants in *Turpin, Silva* and *Jackson* fled or tried to avoid persons who were readily identifiable as police officers. In this case the record does not establish that defendant's flight could reasonably be construed by an officer as an attempt to avoid police contact as is argued by the government. Sgt. Jerylo testified that after he asked defendant if he could speak to him, defendant turned his head, and while glancing behind, made eye contact with Sgt. Jerylo. Sgt. Jerylo further testified that he identified himself to defendant by holding his badge out in front of him while he

was following twenty feet behind defendant outside the St. Paul bus depot in February, before sun rise. Under these circumstances the court cannot speculate as to whether defendant saw Sgt. Jerylo's badge and therefore had identified Sgt. Jerylo as a police officer.

C. *Defendant's statements should be suppressed as the product of an illegal seizure.*

■ Defendant made voluntary statements to the officers while he was being transported to jail. The court finds that defendant's arrest was illegal. A court may admit evidence that would not have been obtained but for the illegal governmental conduct if the acquisition of the illegal evidence is so attenuated as to purge the evidence of primary taint. While the government correctly argues that defendant's volunteered statements do not violate the Fifth Amendment, such statements which are the product of an unlawful arrest do violate the Fourth Amendment. *Wong Sun v. United States,* 371 U.S. 471, 491, 83 S.Ct. 407, 419, 9 L.Ed.2d 441 (1963). Indeed, the facts surrounding the statements here are identical to the facts of the statements made by Toy in *Wong Sun.* The *Wong Sun* Court held that statements made by Toy immediately upon his arrest in his bedroom should have been suppressed as the fruit of his unlawful arrest. *Id.* at 484–87, 83 S.Ct. at 415–17. In *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) the Supreme Court set forth three factors to consider when determining whether the causal connection has been broken when the government wishes to admit evidence obtained

---

**8.** The form of a person's refusal to speak to the police cannot be the only factor that turns a consensual encounter into a reasonable suspicion justifying a *Terry* stop. The Supreme Court has repeatedly observed in dicta that refusal to cooperate with a policeman's attempt to engage a person in consensual conversation, does not alone furnish a justification for detaining the recalcitrant individual. *See Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 1323, 75 L.Ed.2d 229 (1983) (refusal to listen to or answer police officer during consensual encounter does not furnish objective justification for detaining person); *Florida v. Bostick,* — U.S. ——, 111 S.Ct. 2382, 2387, 115 L.Ed.2d 389

(1991) (refusal to cooperate with police during consensual encounter, without more, does not furnish minimum level of objective justification needed for detention). *See also United States v. Wilson,* 953 F.2d 116, 126 (4th Cir.1991) (consensual encounter became an unjustified seizure when police continued to badger a traveller with questions as he attempted to walk away after refusing the officers' request to search his coat). The adverse inference that an officer draws about the way a person communicates his desire not to speak to an officer is nothing more than a hunch which, under *Terry,* cannot become the sole basis for detaining a person.

following an illegal arrest.[9] *Id.* at 603–04, 95 S.Ct. at 2261–62. The government bears the burden of establishing the admissibility of evidence obtained following an illegal arrest. *Dunaway v. New York*, 442 U.S. at 217–18, 99 S.Ct. at 2259.

While the government argues that defendant's voluntary statements are admissible under the Fifth Amendment, the government fails to establish that defendant's statements are attenuated from the illegal taint of the Fourth Amendment violation and the statements must, therefore, be suppressed. *See, e.g., Florida v. Royer*, 460 U.S. at 510, 103 S.Ct. at 1331 (statements made during an illegal detention are inadmissible even though voluntary if they are the product of an illegal detention and not the result of an independent act of free will).

Accordingly, based on the files, records and proceedings herein,

IT IS RECOMMENDED that:

1. Defendant's motion to suppress evidence be granted to the extent that defendant seeks to suppress evidence seized from his person but that defendant's motion to suppress evidence be denied to the extent that defendant seeks to suppress the contents of the discarded athletic bag;

2. Defendant's motion to suppress statements be granted.

DATED: June 26, 1992

Pursuant to Local Rule 72.1(c)(2), any party may object to this report and recommendation by filing with the Clerk of Court and serving all parties, within ten days after being served with a copy thereof, written objections which specifically identify the portions of the proposed findings, recommendations or report to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within ten days after service thereof. All briefs filed under this rule shall be limited to ten pages. A judge shall make a de novo determination of those portions to which objection is made.

**9.** The three factors the courts should consider are: (1) the time elapsing between the illegal seizure and the acquisition of the evidence; (2)

Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this report and recommendation, the party making the objections shall timely order and cause to be filed within 10 days, a complete transcript of the hearing.

the presence of intervening circumstances; and (3) the purpose and flagrancy of the governmental misconduct.