

# NUMBER 13-23-00558-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

VERNON KING DIXON,                                                    Appellant,

v.

THE STATE OF TEXAS,                                                    Appellee.

## ON APPEAL FROM THE 187TH DISTRICT COURT
## OF BEXAR COUNTY, TEXAS

## MEMORANDUM OPINION

**Before Chief Justice Tijerina and Justices West and Fonseca**
**Memorandum Opinion by Justice Fonseca**

In three separate judgments, appellant Vernon King Dixon was convicted of murder, a first-degree felony (Count I); unlawful possession of a firearm by a felon, a third-degree felony (Count II); and tampering with physical evidence, a third-degree felony (Count III). *See* TEX. PENAL CODE ANN. §§ 19.02, 37.09, 46.04. Dixon pleaded true to an allegation that he was a habitual felony offender, and he was sentenced to concurrent

prison terms of life, sixty years, and sixty years for the respective offenses. *See id.* § 12.42(d). On appeal, Dixon argues by five issues that the trial court abused its discretion by admitting certain evidence and that his trial counsel provided ineffective assistance. We affirm.[1]

## I. BACKGROUND

On March 31, 2022, San Antonio police responded to a report of a shooting in progress at the East Meadows apartment complex. Upon arrival, they saw that Avante Boyce had been shot in the left lower back and left buttock and was unresponsive. He was later pronounced dead. An autopsy revealed that the gunshot wound to his back was fatal. Two projectiles were recovered during the autopsy, and forensic analysis showed that they were consistent with two .38 Special-caliber bullets fired from the same weapon. Gunshot residue was not found on Boyce's hands, but it was found on the headliner and front seats of a red Chrysler 300 next to where Boyce was found.

Ezalvonne "Ezie" Lewis testified that Boyce was her husband and father to her two sons. She stated that her mother Shari Lewis was in a long-term dating relationship with Dixon, and Ezie considered Dixon "[a] father." On the day of the shooting, Dixon picked up Ezie and Boyce in his red Chrysler 300 and took them to his sister Jackie's home at the East Meadows complex. According to Ezie, Dixon's daughter Imunique and his stepdaughter Raymenisha were also present at Jackie's apartment.

Ezie said that Dixon was acting "out of character" that day and that he became

---

[1] This appeal was transferred from the Fourth Court of Appeals in San Antonio pursuant to an order issued by the Texas Supreme Court. *See* TEX. GOV'T CODE ANN. § 73.001. We are required to follow the precedent of the transferor court to the extent it differs from our own. TEX. R. APP. P. 41.3.

"disappointed" after speaking on the phone with Shari. Ezie testified that, after Dixon's phone call with Shari, Imunique and Raymenisha "attacked [Ezie]" physically. Ezie elaborated:

> [O]ne of [Dixon's] daughters was like when my auntie pull up, that—that she was going to slap my mom and auntie. So I got out the back seat, and I was like, "Ain't nobody going to slap my mama or my auntie." And that's when his daughters just ran up on me.

Ezie agreed that she, Imunique and Raymenisha were "hitting each other" and that Boyce and Dixon tried to separate them. She stated she was holding her six-month-old son "in [her] hand" throughout the altercation.

After the fight broke up, Ezie, Boyce, and Dixon returned to Dixon's car. Dixon was in the driver's seat and was wearing a white tracksuit; Boyce was in the front passenger seat and Ezie and the child were in the rear driver's-side seat. Ezie testified that Dixon drove the car "[j]ust a little up and back" then put the car in park; he then said "[f**]k this," got out of the car, and "[s]hot [Boyce]." Boyce was injured but was able to crawl out of the car. Ezie said that Dixon then "came to the back seat and grabbed [her] son out by his leg." He had what appeared to be "an old Western gun" in his hand at the time.[2] Ezie said Dixon then got into a different car with his mother and left the scene.

Carl Cunnigen, a maintenance worker at East Meadows, testified that on March 31, 2022, he "hear[d] some commotion" and noticed some women were arguing verbally and physically. He "felt that something was getting too hectic," so he started taking photos with his cell phone. One of the photos depicted a white-clad man standing outside a red

---

[2] A forensic analyst testified that the caliber of bullet recovered from Boyce's body "is typical of revolvers," and that a revolver is "typically what I would think of, if I thought of a Western gun."

Chrysler—Cunnigen stated that he saw the man shoot a gun into the car. After the shooting, "the gun was handed off and everybody kind of was spreading out." Cunnigen said the shooter then departed in a different "Mazda 7-looking kind of car." As the car left the scene, Cunnigen heard "some loud words being exchanged," including a female voice saying "Why did you do this, or, I told you to come on, or—things of that nature."

Elizabeth Pearl Barnes testified that she is Dixon's and Jackie's mother and Imunique's grandmother. On March 31, 2022, Barnes was driving her Mazda CX-7 and dropped off her grandchildren at the East Meadows complex. She stated that she heard the shooting but denied knowing the identity of the shooter. Barnes then left the scene with Dixon in her Mazda. She said Dixon was crying in the car but would not tell her what happened.

Imunique testified that she had a physical altercation with Ezie on the day in question. She said Dixon was trying to get her to calm down, and Boyce was trying to get Ezie to calm down. Afterward, Dixon got into the driver's seat of his car, Boyce got into the passenger seat, and Ezie got into the back seat with her baby. Like Barnes, Imunique testified that she heard the shooting but did not see it and did not know who the shooter was. She said her husband Donald Neally was also at the apartment that day.

Neally testified that he "heard a commotion" and went outside to find Imunique and Ezie fighting. Shortly after, he "hear[d] two shots." He then saw Dixon "come around the car and just wave the gun at everybody," saying "Hey, look at what you did to me. Look at what you made me do." According to Neally, Dixon pointed the silver gun at him, said "here," and handed it to him. Neally said he threw the gun in a nearby ditch.

4

Dixon was convicted and sentenced as set forth above. This appeal followed.

## II. ADMISSION OF EVIDENCE

Dixon's first two issues contend that the trial court abused its discretion by admitting certain evidence. "We review a trial court's ruling on the admissibility of evidence under an abuse of discretion standard, and we must uphold the trial court's ruling if it was within the zone of reasonable disagreement." *Wells v. State*, 611 S.W.3d 396, 427 (Tex. Crim. App. 2020).

### A. Pertinent Facts

At the beginning of the last day of the guilt-innocence phase of trial, the court held a hearing outside the presence of the jury on a motion filed by Dixon to suppress a video-recorded statement he made to San Antonio Police Department homicide detective Juan Espinoza. *See Alvarado v. State*, 912 S.W.2d 199, 211 (Tex. Crim. App. 1995) (en banc) ("Once a defendant moves to suppress a statement on the ground of 'involuntariness,' the due process guarantee requires the trial court to hold a hearing on the admissibility of the statement outside the presence of the jury." (citing *Jackson v. Denno*, 378 U.S. 368, 380 (1964))).

Espinoza stated at the hearing that he interviewed Dixon at the Bexar County Jail in September of 2022. He stated that, before the interview, he advised Dixon of his *Miranda* rights, including his right to have an attorney present, and Dixon voluntarily waived those rights. *See Miranda v. Arizona*, 384 U.S. 436 (1966); TEX. CODE CRIM. PROC. ANN. art. 38.22, § 3(a)(2). Espinoza identified State's Exhibit 40 as an accurate video recording of the interview. Defense counsel noted that at one point during the video, Dixon advised Espinoza that he had recently been appointed an attorney, and counsel argued

5

that any statement Dixon made after that point would be inadmissible. Counsel also argued that the court should suppress any statements about Dixon being arrested outside of Texas because they are more prejudicial than probative. *See* TEX. R. EVID. 403. Counsel did not argue that Dixon's statements were made involuntarily. The court overruled both objections.

Espinoza then testified in front of the jury. He stated that he interviewed Ezie and Cunnigen on the day of the shooting, and because of those interviews, Dixon was identified as a suspect, and a warrant was issued for his arrest. Espinoza testified that Dixon was eventually apprehended in June of 2022 by United States Marshals in Wichita, Kansas. As to his custodial interview of Dixon, Espinoza testified consistently with his prior hearing testimony. Espinoza further testified that, during the custodial interview, Dixon admitted that he was at the scene of the shooting and told Espinosa what he was wearing at the time, but did not admit to the shooting or identify the shooter.

At that point, the jury was excused, and the following colloquy took place:

| THE COURT: | . . . State and Defense, with regards to the State's Exhibit No. 40. Defense, you were saying that you would like for the State to offer that in the presence of the jury? |
|---|---|
| [Defense counsel]: | Just one second, Your Honor. |
| | We can, Judge. I mean, it's our understanding it's the Court's intent it will [] not be admitted. I think just so it clears it up for the—for the jury, just so they understand it's not coming in. I just don't want there to be any confusion among them. |
| THE COURT: | All right. And with the testimony regarding the defendant was found in Kansas, there—is there no objection to that? |

6

| | |
|---|---|
| [Defense counsel]: | I don't have any objection, Your Honor. Because that was independently verifiable through other means. I don't think it necessarily goes to the substance of Mr. Dixon's statements. So we're not opposed to anything about him being captured in Kansas. The Court has already given a ruling on that matter. So we're not opposed to—if the State intends to go into that, we're not opposed subject to our previous objection, obviously. |
| THE COURT: | All right. |
| [Defense counsel]: | But I don't believe his statement was dependent upon this detective knowing that he was found in Kansas. |
| THE COURT: | Okay. All right. With that, is everybody ready to bring the jurors back in? |
| [Prosecutor]: | I'm sorry. Just a brief moment. I was just—let me—can I just confer briefly. |
| THE COURT: | Sure. |
| [Prosecutor]: | Judge, sorry. I mean, I don't know if you want this on the record or not. |
| THE COURT: | Sure. |
| [Prosecutor]: | But it's just sort—the State's—I've had time to reflect on it just slightly. We may not even offer it, because it has not been offered at this point. So if we don't offer it— |
| [Defense co-counsel]: | It was offered and admitted already. |
| | (Speaking simultaneously.) |
| [Defense co-counsel]: | Just for the purposes of just— |
| [Defense counsel]: | The [*Denno*] hearing. |
| THE COURT: | Yes. |
| [Prosecutor]: | And, Judge, if—if you want to do outside the presence saying that you are granting their motion to suppress, State's not opposed to that. But I think |

7

|                      | that it might be more confusing if—if we offer it and then it's denied in front of the jury now because of that purpose. |
| -------------------- | ------------------------------------------------------------------------------------------------------------------------ |
| [Defense counsel]:   | Your Honor, the Defense would tend to agree with State, actually. I think it's proper to say motion to suppress as to the statement is granted; however, I think just putting that in front of the jury is just going to confuse them and create chaos, which is never good for anyone. |
| THE COURT:           | All right. Then with regards to State's Exhibit No. 40 that was offered for review, for the [*Jackson*] hearing, the Court has previously determined that it was admissible. But after reviewing the DVD again, which is State's Exhibit No. 40 and reviewing it with both Defense and the State and understanding what was actually said on the DVD, the Court is going to grant the Defense's motion to suppress State's Exhibit No. 40. |

The jury was brought back into the courtroom, and parties asked no further questions of Espinoza.

## B.  Out-of-State Arrest

By his first issue, Dixon contends the trial court erred by "admitting evidence that [he] was arrested in Wichita, Kansas." He claims on appeal that his arrest in Kansas "was irrelevant to any fact in issue" and that "any probative value of that evidence was substantially outweighed by the danger of unfair prejudice." *See* TEX. R. EVID. 403.

To serve as a basis for reversal on appeal, any error regarding the admission of evidence must be preserved by a timely request, objection, or motion in the trial court. TEX. R. APP. P. 33.1(a)(1). As illustrated above, defense counsel timely objected to State's Exhibit 40 on the basis that evidence of his arrest was more prejudicial than probative, and the trial court initially overruled the objection. However, the trial court later reversed its ruling, and State's Exhibit 40 was never admitted as evidence, nor was it published or

8

played for the jury. Moreover, when the prosecutor asked Espinoza about the arrest in front of the jury, and Espinoza testified that Dixon had been arrested in Kansas, defense counsel did not object to either the question or the answer. Counsel later affirmed that he had no objection to evidence in State's Exhibit 40 regarding Dixon's arrest because the arrest was "independently verifiable through other means"—i.e., Espinoza had already testified about it. Though counsel stated that his lack of opposition was "subject to our previous objection," the previous objection only challenged the admissibility of State's Exhibit 40. Dixon never specifically objected to Espinoza's testimony about the arrest, nor did he object generally to any and all evidence regarding the arrest.[3]

Even assuming the issue was preserved, it lacks merit. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." TEX. R. EVID. 401. Under Rule 403, even relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." TEX. R. EVID. 403. When undertaking a Rule 403 analysis, a trial court must balance:

> (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the

---

[3] Dixon argues that he "preserved error in his pretrial Motions in Limine, Request for Notice of Extraneous Conduct, and during the *Jackson v. Denno* hearing held on [his] Motion to Suppress." However, motions in limine do not preserve error. *Fuller v. State*, 253 S.W.3d 220, 232 (Tex. Crim. App. 2008) ("For error to be preserved with regard to the subject of a motion in limine, an objection must be made at the time the subject is raised during trial."). Dixon cites no authority establishing that a request for notice of intent to offer evidence of extraneous bad acts under Texas Rule of Evidence 404(b) preserves error, and we find none. And, as noted above, the *Jackson v. Denno* hearing was limited to the issue of whether State's Exhibit 40 was admissible.

evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.

*Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006).

Dixon cites outdated authority casting doubt on the probative value of evidence that a defendant fled the scene of a crime. *See Wong Sun v. United States*, 371 U.S. 471, 483 n.10 (1963) ("[W]e have consistently doubted the probative value in criminal trials of evidence that the accused fled the scene of an actual or supposed crime."); *Alberty v. United States*, 162 U.S. 499, 511 (1896) ("[I]t is a matter of common knowledge that men who are entirely innocent do sometimes fly from the scene of a crime through fear of being apprehended as the guilty parties, or from an unwillingness to appear as witnesses."); *Vick v. United States*, 216 F.2d 228, 233 (5th Cir. 1954) (noting, where appellant fled from a unregistered distillery, that "under the circumstances of this case, flight alone is weak evidence of guilt"). But it is well-established that "flight is admissible as a circumstance from which an inference of guilt may be drawn." *Devoe v. State*, 354 S.W.3d 457, 470 (Tex. Crim. App. 2011) (quoting *Alba v. State*, 905 S.W.2d 581, 586 (Tex. Crim. App. 1995)); *Clay v. State*, 240 S.W.3d 895, 905 n.11 (Tex. Crim. App. 2007) (noting that flight evinces a consciousness of guilt); *Bigby v. State*, 892 S.W.2d 864, 883 (Tex. Crim. App. 1994) (same). Dixon does not otherwise address the factors set forth in *Gigliobianco*. In particular, he does not explain how or why the subject evidence was unfairly prejudicial to him.[4] *See* TEX. R. APP. P. 38.1(i). We agree with the State that the

---

[4] As the State notes, Dixon also does not explain how or why the admission of the subject evidence caused him to suffer the requisite level of harm. *See* TEX. R. APP. P. 38.1(i), 44.2.

subject evidence "did not take an inordinate amount of time in the record, distract the jury, or suggest a decision on an improper basis." *See Gigliobianco*, 210 S.W.3d at 641–42.

We conclude the trial court did not abuse its discretion in admitting the evidence under Rule 403. Dixon's first issue is overruled.

## C.    Custodial Statements

By his second issue, Dixon contends that the trial court erred by "admitting evidence of [his] suppressed custodial statements before the jury." Dixon argues that the statements he made in the interview were inadmissible because the interview continued after he "invoked his right to counsel" under the Sixth Amendment. He further contends that "evidence of his silence regarding the identity of the shooter" violated his due process rights.

As set forth above, the trial court eventually sustained Dixon's objections to State's Exhibit 40, and the exhibit was never before the jury. Dixon appears to argue, however, that evidence of the statements he made in that exhibit was introduced through Espinoza's testimony. But, as noted, defense counsel did not object to Espinoza's testimony. Accordingly, any error in admitting that testimony would not be reversible. *See* TEX. R. APP. P. 33.1(a); *see also Valle v. State*, 109 S.W.3d 500, 509 (Tex. Crim. App. 2003) ("An error in the admission of evidence is cured where the same evidence comes in elsewhere without objection.").

Even if the issue was preserved, constitutional error is not reversible if we determine beyond a reasonable doubt that the error did not contribute to the conviction. TEX. R. APP. P. 44.2(a). When analyzing constitutional error, "the question for the reviewing court is not whether the jury verdict was supported by the evidence." *Scott v.*

11

*State*, 227 S.W.3d 670, 690 (Tex. Crim. App. 2007). "Instead, the question is the likelihood that the constitutional error was actually a contributing factor in the jury's deliberations in arriving at that verdict—whether, in other words, the error adversely affected 'the integrity of the process leading to the conviction.'" *Id.* (quoting *Harris v. State*, 790 S.W.2d 568, 588 (Tex. Crim. App. 1989), *disagreed with on other grounds by Snowden v. State*, 353 S.W.3d 815, 822 (Tex. Crim. App. 2011)).

In attempting to explain how he was harmed by the admission of Espinoza's testimony, Dixon relies on case law establishing that "a defendant's confession is probably the most probative and damaging evidence that can be admitted against him." *Arizona v. Fulminante*, 499 U.S. 279, 292 (1991) (internal quotation omitted); *see id.* at 296 ("[T]he admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct. Certainly, confessions have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so."); *see also McCarthy v. State*, 65 S.W.3d 47, 56 (Tex. Crim. App. 2001). But Espinoza did not testify that Dixon confessed to anything other than being present at the scene of the shooting, a fact Dixon has never contested. And the remaining evidence—including testimony by two eyewitnesses that Dixon shot Boyce—strongly supported a finding of guilt. *See Scott*, 227 S.W.3d at 690.

Further, though Espinoza testified that Dixon did not reveal the shooter's identity at the interview,[5] the prosecutor did not mention this fact in argument or otherwise draw

---

[5] Dixon argues that "Espinoza's testimony that [Dixon] knew who committed the shooting but

attention to it. *Cf. Doyle v. Ohio*, 426 U.S. 610, 619 (1976) (quoting *United States v. Hale*, 422 U.S. 171, 183 (1975) (White, J., concurring)) ("[W]hen a person under arrest is informed, as *Miranda* requires, that he may remain silent, that anything he says may be used against him, and that he may have an attorney if he wishes, . . . it does not comport with due process to permit the prosecution during the trial to call attention to his silence at the time of arrest and to insist that because he did not speak about the facts of the case at that time, as he was told he need not do, an unfavorable inference might be drawn as to the truth of his trial testimony."); *Griffin v. California*, 380 U.S. 609, 615 (1965) ("[T]he Fifth Amendment . . . forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt."); *see also* TEX. CODE CRIM. PROC. ANN. art. 38.08 ("Any defendant in a criminal action shall be permitted to testify in his own behalf therein, but the failure of any defendant to so testify shall not be taken as a circumstance against him, nor shall the same be alluded to or commented on by counsel in the cause.").

For the foregoing reasons, we conclude beyond a reasonable doubt that the admission of Espinoza's testimony, even if erroneous, did not contribute to the jury's verdicts. *See* TEX. R. APP. P. 44.2(a). Dixon's second issue is overruled.[6]

---

remained silent was inadmissible and in violation of [Dixon's] due process rights under *Doyle v. Ohio*." However, Espinoza did not clearly testify that Dixon told him "that [Dixon] knew who committed the shooting." Instead, the prosecutor asked "Did [Dixon] state that he—whether he knew who did the shooting?" and Espinoza replied, "He did mention it."

[6] In his argument as to this issue, Dixon notes that a trial court must enter findings of fact and conclusions of law whenever "a question is raised" as to the voluntariness of a custodial statement and the statement is found to have been voluntarily made. TEX. CODE CRIM. PROC. ANN. art. 38.22, § 6. But here, the trial court eventually sustained Dixon's objection to State's Exhibit 40, and it did not make any explicit or implicit determination that his custodial statements were voluntarily made. Accordingly, there was no obligation to enter findings of fact or conclusions of law under the statute.

### III.    INEFFECTIVE ASSISTANCE OF COUNSEL

By his final three issues, Dixon contends that his trial counsel provided ineffective assistance. We will address the issues together, as Dixon does in his brief.

### A.    Standard of Review and Applicable Law

The United States and Texas Constitutions guarantee a criminal defendant the right to reasonably effective assistance of counsel. U.S. CONST. amend. VI; TEX. CONST. art. I, § 10; *see* TEX. CODE CRIM. PROC. ANN. art. 1.051; *Strickland v. Washington*, 466 U.S. 668, 686 (1984). To obtain a reversal of a conviction on grounds of ineffective assistance of counsel, an appellant must show: "(1) counsel's performance fell below an objective standard of reasonableness," and "(2) counsel's deficient performance prejudiced the defense, resulting in an unreliable or fundamentally unfair outcome of the proceeding." *Davis v. State*, 278 S.W.3d 346, 352 (Tex. Crim. App. 2009) (citing *Strickland*, 466 U.S. at 687). "Deficient performance means that 'counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'" *Ex parte Napper*, 322 S.W.3d 202, 246 (Tex. Crim. App. 2010) (quoting *Strickland*, 466 U.S. at 687). "The prejudice prong of *Strickland* requires showing 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* at 248 (quoting *Strickland*, 466 U.S. at 694). "Any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness." *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999).[7]

---

[7] For this reason, especially when there has been no post-trial development of the record, "claims

The burden is on the appellant to prove ineffective assistance of counsel by a preponderance of the evidence. *Id.* The appellant must overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance and that his actions could be considered sound trial strategy. *See Strickland*, 466 U.S. at 689. "[W]e commonly assume a strategic motive if any can be imagined and find counsel's performance deficient only if the conduct was so outrageous that no competent attorney would have engaged in it." *Andrews v. State*, 159 S.W.3d 98, 101 (Tex. Crim. App. 2005). Counsel's effectiveness is judged by the totality of the representation, not by isolated acts or omissions. *Thompson*, 9 S.W.3d at 813.

## B.     Analysis

Dixon contends by his final three issues that his trial counsel was ineffective because he: (1) "failed to request instructions to the jury on the extraneous evidence that [Dixon] was arrested in Wichita, Kansas"; (2) "failed to object to inadmissible evidence presented to the jury obtained from his suppressed custodial interrogation"; and (3) "failed to request instructions to the jury and in the charge on the legality of his suppressed custodial statement."

As to the first complaint, Dixon appears to argue that the evidence of his arrest in Kansas constituted "[e]vidence of a crime, wrong, or other act" offered "to prove [his] character in order to show that on a particular occasion [he] acted in accordance with the character," such that he would have been entitled to a limiting instruction in the jury charge

---

of ineffective assistance of counsel are generally not successful on direct appeal and are more appropriately urged in a hearing on an application for a writ of habeas corpus." *Lopez v. State*, 343 S.W.3d 137, 143 (Tex. Crim. App. 2011); *see Thompson v. State*, 9 S.W.3d 808, 814–15 (Tex. Crim. App. 1999) (noting that a habeas application would "provide an opportunity to conduct a dedicated hearing to consider the facts, circumstances, and rationale behind counsel's actions at . . . trial").

had counsel requested one. *See* TEX. R. EVID. 404(b)(1); *Ex parte Varelas*, 45 S.W.3d 627, 631 (Tex. Crim. App. 2001) ("[A] jury should be instructed that they are not to consider extraneous act evidence unless they believe beyond a reasonable doubt that the defendant committed that act."). However, Dixon's arrest in Kansas was not offered for character conformity purposes; rather, it was offered to demonstrate his consciousness of guilt. *See* TEX. R. EVID. 404(b)(2); *Clay*, 240 S.W.3d at 905 n.11. Accordingly, he would not have been entitled to an instruction in the jury charge.

Regarding the second and third complaints, we have already held that the admission of Espinoza's testimony regarding what Dixon said in his custodial interview was not a "contributing factor in the jury's deliberations in arriving" at its verdict. *See Scott*, 227 S.W.3d at 690. Moreover, at the hearing on the final day of trial, Dixon did not argue his statements to Espinoza were made involuntarily—nevertheless, the trial court sustained counsel's objection to State's Exhibit 40 and the exhibit never came before the jury. On appeal, Dixon points to no evidence that his statements to Espinoza were made involuntarily such that he would be entitled to an instruction under § 6 of Texas Code of Criminal Procedure article 38.22. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 6; *Oursbourn v. State*, 259 S.W.3d 159, 175 (Tex. Crim. App. 2008) ("[I]f the trial judge decides that the confession was voluntary, it will be admitted, and a party may offer evidence before the jury suggesting that the confession was not in fact voluntary . . . if such evidence is offered before the jury, the trial judge shall give the jury a voluntariness instruction"). For these reasons, even if counsel had lodged an objection to Espinoza's testimony and requested an instruction on voluntariness, it is highly likely that the court would have rejected them. On this record, we cannot conclude that counsel's

16

performance fell below an objective standard of reasonableness. *See Davis*, 278 S.W.3d at 352.

We overrule Dixon's third, fourth, and fifth issues.

## IV. CONCLUSION

The trial court's judgments are affirmed.

YSMAEL D. FONSECA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed on the
18th day of June, 2025.